A04A1836, A04A1837. CITY OF ATLANTA v. LANDMARK
ENVIRONMENTAL INDUSTRIES, INC.; and vice versa.
A04A1838, A04A1839. CITY OF ATLANTA v. YARDUM;
and vice versa.
(613 SE2d 131)

PHIPPS, Judge.

Landmark Environmental Industries, Inc. (LEI) filed a nuisance action against the City of Atlanta (City), claiming that the City had inversely condemned the business by allowing sewage to leak from its sewer line along Perry Boulevard and invade LEI's operating site, 2100 Spinks Street, NW (the Property). LEI had been leasing the Property from its owner, Ruth Yardum. Based on the contamination of her Property, Yardum filed a separate nuisance action against the City. The two lawsuits were consolidated for trial.

The jury found in favor of LEI and Yardum, awarding LEI $2,528,942.21 in damages and awarding Yardum $4,537,357.98 in damages and $250,615.82 in attorney fees. LEI then sought prejudgment interest, but was denied. The City moved for judgment notwithstanding the verdict (j.n.o.v.) in both cases. The trial court vacated Yardum's attorney fees award and denied the City's motions in all other aspects.

In Case No. A04A1836, the City appeals the judgment entered against it in favor of LEI. In Case No. A04A1837, LEI challenges the denial of its motion for prejudgment interest. In Case No. A04A1838, the City appeals the judgment entered against it in favor of Yardum. In Case No. A04A1839, Yardum challenges the vacation of her attorney fees award. In Case No. A04A1836, the evidence failed to adequately support the damages award. The judgment is therefore reversed and the case is remanded for retrial on the issue of damages only. The judgments in Case Nos. A04A1837 and A04A1838 are affirmed. In Case No. A04A1839, the evidence amply authorized an award of attorney fees, and the jury's award is therefore reinstated.

*Case No. A04A1836*

1. The City contends that the trial court erred in denying its motion for j.n.o.v., arguing that "[it] could not be charged with knowledge that its Perry Boulevard sewer caused the alleged contamination." On appeal from the denial of a motion for j.n.o.v., this court determines whether, construing the evidence in the light most favorable to the party who obtained the jury verdict, there is any evidence to support the jury's verdict.[1]

To state a claim of nuisance against a municipality, a plaintiff must establish that (1) the city's conduct was egregious enough to exceed mere negligence, (2) the resulting continuous or repetitious dangerous condition was of some duration, and (3) the city failed to correct the danger within a reasonable time after acquiring knowledge of the defect or dangerous condition.[2]

Construed in a light most favorably to LEI (and Yardum[3]), the evidence showed that the Property is comprised of 19.8 acres in Atlanta, just south of Bolton Road, in a predominantly industrial area. It is bordered by Spinks Street to the north, a wooded area to the west, a railroad line to the south, and a Georgia Power transmission line easement to the east. Perry Boulevard, which runs generally east to west, is 480 feet south and approximately 40 feet higher than the southern boundary of the Property. About 560 feet south of that boundary of the Property is a watershed divide,[4] the highest terrain in the vicinity, which also runs generally east to west approximately 50 feet higher than the southern boundary of the Property. An apartment complex on Perry Boulevard is served by a sewer line that runs beneath Perry Boulevard (the "Perry Boulevard sewer"). The City owns and maintains that sewer line.

In June 1998, LEI leased the Property from Yardum for a term extending to July 2006, and it began operating its business there in August 1998. LEI had two sources of income: (1) it charged a fee for accepting onto its premises yard clippings, wood shavings, lettuce, bakery ingredient waste, and other organic materials from local companies and nearby municipalities; and (2) it mixed those materials into a soil amendment and sold that product to various companies.

---

[1] *Sims v. Sims*, 265 Ga. 55, 56 (452 SE2d 761) (1995).

[2] *City of Bowman v. Gunnells*, 243 Ga. 809, 811 (2) (256 SE2d 782) (1979).

[3] In Division 6, infra, we address the City's similar contention with respect to Yardum's nuisance claim.

[4] An expert ground water geologist explained, "think of [a watershed divide] like the roof of a house and when it rains you pour a barrel of water on top of the roof line. Some would go to the one side and the other would go to the other side. So that's a watershed divide."

Frank Thomas, LEI's owner, testified that in the summer of 1998, he saw "raw sewage feces" floating in a ravine across the street from the Property. He obtained an analysis of the liquid, which showed the presence of elevated levels of fecal coliform bacteria. Thomas notified the City's sewer department, which dispatched a crew to the area. Thomas testified that the crew did little more than state that "the sewage was buried along the Property." Although Thomas thereafter made repeated calls to the City, no City worker returned.

In January 1999, Thomas noticed that small wet spots had begun appearing on the Property. The next month, a City council member contacted him about complaints of an odor emitting from LEI's area. Thomas informed the council member about the ravine matter and asked her to come to the site. She did not; however, her office subsequently referred those who complained about the odor directly to LEI.

Thereafter flooded with telephone calls, Thomas contacted the Environmental Protection Division of the Georgia Department of Natural Resources (EPD). A representative made several visits to the Property and took samples. In March, several EPD representatives met a City sewer department employee at the Property. After seeing the liquid in the ravine, the City employee concluded that its color was due to tannin from leaves. In April 1999, a City crew made an unannounced visit to the Property, but only searched for sewer lines. In May 1999, EPD representatives observed an accumulation of "black septic material" at the Property. By June, Thomas testified, the Property had an "upswelling through the ground of a black liquid, smelled like sewage."

One day in June, the City's solid waste disposal operational manager happened upon the Property while in the area investigating the continuous odor complaints. He testified, "I showed up[.] I told them I was there to investigate an odor, and then [Thomas] immediately took me [to a manhole across the street]. So, I, I inferred from that, that they thought that was the source of the odor." After several visits to the Property, however, he concluded that the odor was caused by certain materials that LEI was stockpiling at the Property.

On June 21, 1999, the City performed sampling and testing at three locations on the Property. Results showed levels of fecal coliform bacteria in excess of safety limits. Testifying about other efforts by the City, Thomas recalled that on a daily basis during that month, City employees "just would drive up the driveway [of the Property] and turn around and drive right back out."

Meanwhile, Thomas hired a geologist, Gary Simpson, who in mid-June went to the Property to investigate what Thomas believed to be raw sewage contamination. Simpson observed a "black, foul

smelling liquid on the ground surface." His samplings at the Property revealed levels of fecal coliform bacteria. In July, having investigated the topography of the area, he and Thomas met with the City's chief operating officer, its engineering and environmental director, and its deputy administrator concerning the condition of the Property. They presented their findings, told the officials that the City's sewer lines in the area of the Property were likely causing raw sewage outbreaks, and asked for the City's assistance. According to Simpson, the officials yawned, labeled the theory highly speculative, and stated that they would take the matter into consideration.

A few days later, Thomas and Simpson presented the matter to EPD officials. By then, Thomas testified, raw sewage was on the ground throughout the Property and throughout the acreage across Spinks Street. On July 21, an environmental specialist with the EPD inspected the Property and found it so saturated that one could not walk across it "without sinking up to your knees." He determined that the nature of the problem appeared to be a "seepage of liquid of unknown source out of the ground on the LEI property." The environmental specialist testified that the contamination "had been going on for sometime. There had been a lot of investigation, but at that point didn't seem to be a whole lot of action taken resulting from the prior testing . . . fecal coliform certainly suggested there was a possibility of a problem with the sewage in the area." Thereafter, the EPD focused on the City's sewer lines.

On July 23, the EPD issued an emergency order to the City stating that the situation on the Property was an emergency condition that needed to be addressed immediately. The order directed the City to conduct a survey of all sewer lines and manholes within a 1.5 mile radius of the emergency condition to determine the source of the malodorous septic black material. The City commissioned a contractor to perform a closed circuit television inspection of only the sewers that the City believed had "the potential of attributing to the problem occurring at [the Property]." Such inspection did include the Perry Boulevard sewer. As stipulated by the parties, "the inspection revealed that the sewer system in the area of the Property contained numerous cracks, openings and separations." The contractor concluded, however, that the City's sewer system was not contributing to the problems on the Property. The City submitted that conclusion to the EPD. The EPD responded to the City that it had failed to comply fully with the emergency order and requested it again to investigate the sewers within a 1.5 mile radius of the Property. As of the time of trial, the City had not done so, and the EPD had taken no further steps.

Due to the worsening contamination at the Property, LEI could no longer conduct its business. It terminated its lease with Yardum and ceased operations on July 31, 1999.

A municipality may be liable for maintaining a nuisance when it knew or should have known of the existence of the nuisance.[5] The City contends that it could not be charged with such knowledge, asserting that although various testing done on the Property in May and June 1999 revealed fecal coliform contamination, no test confirmed the bacteria's source. It also cites the contractor's exclusion of its sewer lines as the source. The City also asserts that the evidence showed "the undisputed fact that Perry Boulevard sewer line and the Property are in different drainage basins" and that "[s]ewage cannot cross from one basin to another."

But the inspection performed by the contractor was not in full compliance with the EPD's order. And even such partial compliance undisputedly revealed that the City's sewer lines in the vicinity of the Property contained numerous cracks, openings, and separations. Turning to the City's assertion about the basins in the area, we note that the part of the trial transcript cited by the City as support for its assertion is actually inconsistent with its assertion. At that part, the City's 1999 Public Works Manager testified that "the water that goes on the north side of Perry Boulevard will flow into [one basin]. The water that flows on the south side flows [into a different basin]." Furthermore, the jury heard testimony from Simpson, the plaintiffs' expert geologist, that based on the condition of the sewer on Perry Boulevard, there was a reasonable probability that sewage from that sewer entered the ground water in the vicinity of Perry Boulevard. Simpson further explained that groundwater in that area runs in the direction from Perry Boulevard to Spinks Street. There was also evidence that as early as the summer of 1998, the City knew that raw sewage was floating in the ravine across the street from the Property. And in February 1999, the city was persistently contacted about an odor in that area. The evidence in this case authorized the jury to reject the City's position and find that it knew or should have known that it was maintaining a nuisance. Therefore, the trial court did not err as contended.[6]

2. The City contends that the trial court erred in denying its motion for j.n.o.v. as to LEI's claim for business loss damages, arguing that LEI failed to show that the Property was unique. To recover business loss damages, a lessee must show, among other things, that

---

[5] *DeKalb County v. Orwig*, 261 Ga. 137, 139 (2) (402 SE2d 513) (1991).

[6] See id.; *Grier v. City of Atlanta*, 200 Ga. App. 575, 576 (408 SE2d 794) (1991).

the property was unique.[7] Whether a parcel of property is unique for business purposes depends upon the characteristics and location of the property in conjunction with the use to which it is being put.[8] The question of whether a property is unique is for the jury.[9]

Thomas testified that the Property's location met the logistical demands of LEI's business and of its customers. The location was within the traveling range of LEI's customers who delivered the raw materials and of its customers who purchased the company's finished soil product. Some of LEI's key customers were unwilling to travel very far, and if LEI relocated out of the area, the company would have lost their business. The Property provided access for large trucks to enter and exit the business. It also contained a railroad spur, permitting shipments by train, a less expensive alternative to trucking. The site had a dedicated scale house and a building for storing equipment. The nearly 20 acres accommodated a business layout that allowed for demonstrating LEI's operations to prospective customers, which was a successful marketing tool. By July 1999, LEI was using all of the acreage. According to Thomas, LEI required 20-plus acres of open, unobstructed land in close proximity to its current location. And although LEI sought such a location, it was unable to find one that met its needs. We find that the jury was presented ample evidence from which it could find that the Property was unique.[10] Therefore, the trial court did not err as contended.

3. The City contends that the trial court erred in excluding as irrelevant certain correspondence related to the Property being listed by the EPD on its July 1, 1999 Hazardous Site Inventory (HSI) due to metal contamination.[11]

LEI argued at trial that the evidence was not relevant because its cause of action was based solely upon the City's contamination of the Property with fecal coliform bacteria. The City countered that the letters showed that LEI's decision to vacate the Property was influenced by other contamination.

Although the letters were not allowed into evidence, the City did introduce the HSI, which listed the Property as a Class II site because of "a known release of Lead in soil at levels exceeding the reportable quantity." The HSI explained that a Class II designation meant that "further evaluation of the site must be done before EPD can decide whether corrective action is needed." Thomas testified that, before

---

[7] *Dept. of Transp. v. Acree Oil Co.*, 266 Ga. 336, 336-337 (1) (467 SE2d 319) (1996); *Dept. of Transp. v. Dixie Highway Bottle Shop*, 245 Ga. 314, 315 (265 SE2d 10) (1980).

[8] *Raiford v. Dept. of Transp.*, 206 Ga. App. 114, 119 (2) (424 SE2d 789) (1992).

[9] *Dixie Highway Bottle Shop*, supra.

[10] See *Dept. of Transp. v. Clower*, 170 Ga. App. 750, 752-753 (3) (318 SE2d 161) (1984).

[11] See OCGA §§ 12-8-90 through 12-8-97.

LEI moved onto the Property, he knew that the Property had been the site of a car shredding company, that he knew that the EPD considered the Property a "potential site," and that he had spoken with EPD officials and "they said there was [no] concern from their end as far as occupancies on this site." Thomas reiterated that LEI had ceased its operations and terminated the lease because of the fecal coliform bacteria contamination. Under these circumstances, we find that the trial court did not abuse its discretion in excluding the correspondence.[12]

4. The City contends that the trial court erred in denying its motion for new trial, arguing that the amount LEI was awarded in damages was not sustainable.

The verdict returned by the jury simply stated, "We the jury find in favor of the Plaintiff and award damages in the sum of $2,528,942.21." "A general verdict must be construed in light of the pleadings, the issues made by the evidence and the charge of the court."[13] They show that the award was for the value of the condemned business.

> The correct measure of damages that a lessee condemnee can recover for damage to his business is the difference in market value of the business prior to and after the taking. Various elements, such as loss of profits, loss of customers, or possibly what might be termed a decrease in the earning capacity of the business, may all be considered in determining the decrease in value of the business, although these factors do not themselves represent separate elements of damage.[14]

The City argues that in the damages award, LEI obtained an impermissible double recovery[15] — the value of the business, plus an additional amount for a loss of profits. Specifically, the City asserts that the jury arrived at the award amount of $2,528,942.21 by combining LEI's expert's opinion that the value of the business before

---

[12] See *Dept. of Transp. v. Mendel*, 237 Ga. App. 900, 902-903 (2) (517 SE2d 365) (1999) (admissibility of evidence lies in trial court's discretion).

[13] *Hickman Datsun, Inc. v. Foster*, 181 Ga. App. 229, 230 (2) (351 SE2d 678) (1986).

[14] (Footnote omitted.) *Action Sound v. Dept. of Transp.*, 265 Ga. App. 616, 619 (2) (594 SE2d 773) (2004).

[15] See *Ga. Northeastern R. v. Lusk*, 277 Ga. 245, 246 (1) (587 SE2d 643) (2003) (Georgia law prohibits a plaintiff from a double recovery of damages; the plaintiff is entitled to only one recovery and satisfaction of damages, because such recovery and satisfaction is deemed to make the plaintiff whole).

the total taking was approximately $1.6 million[16] with LEI's corporate secretary's testimony that processed soil product abandoned at the Property amounted to "about $920,000.00 worth of income that was projected." The City points out that during closing argument, LEI's counsel referred to LEI's expert's valuation, that he called the jury's attention to the abandoned processed soil product, and, near the end, said to the jury, "We are asking you to award $2.5 million. That's what [LEI] has lost. How do we get there? The product that was lost, the cash flow, the income he would have generated, and this is from [LEI's expert's] report again that he did an analysis."

Without the specifics of the jury's calculations, we cannot know whether the amount constituted a double recovery. "The general rule on appeal of an award of damages is that a jury's award cannot be successfully attacked so as to warrant a new trial unless it is so flagrantly excessive or inadequate, *in light of the evidence,* as to create a clear implication of bias, prejudice, or gross mistake on the part of the jurors."[17]

Attempting to preserve the $2,528,942.21 award, LEI counters that the jury might have calculated that amount by using different assumptions or a different method from those used by its expert. For example, LEI asserts, the jury might have rejected certain of its expert's assumptions underlying his calculations and substituted its own assumptions, leading to a higher damages figure than that of the expert. Alternatively, LEI asserts, the jury might have arrived at its award amount by simply multiplying the $920,000 figure by 3.4 (and then subtracting LEI's debt) — since the abandoned processed soil product might have taken about 18 months to create and since there remained on the lease at the time of taking about 3.4 additional 18-month time periods. Either assertion is mere speculation and wholly unsupported by any evidence that it provides a reliable basis for calculating the market value of the business prior to the total taking.[18] Consequently, LEI's award cannot be affirmed in reliance upon these assertions.

---

[16] LEI introduced in evidence its expert's valuation report concluding that the value of the business before the total taking was $1,606,680. At trial, however, that expert opined that the value of the business before the total taking was $1,650,680.

[17] (Citations and punctuation omitted; emphasis supplied.) *Morris v. Savannah Valley Realty,* 233 Ga. App. 762, 765 (4) (505 SE2d 259) (1998).

[18] See *MARTA v. Martin,* 193 Ga. App. 566, 567-568 (1) (388 SE2d 346) (1989) (jurors were erroneously allowed to reach a verdict as to the existence and the amount of a business loss sustained based solely upon their own knowledge and opinions of the decrease in the value of a business that had "lost seven to eight million dollars"); *Old South Bottle Shop v. Dept. of Transp.,* 175 Ga. App. 295, 296 (2) (333 SE2d 127) (1985) (lost profits are not the only element to be considered in determining the damages resulting from destruction of business).

There is no question that LEI's expert considered the abandoned processed soil product in the valuation. In its appellate brief, LEI concedes that it "pointed out to [its expert] that as of 7/31/99, LEI had created 250,000 cubic yds. of enriched soil for sale, had 75,000 more cubic yds. in process, and had a customer for LEI's entire output." LEI further concedes in that brief that, "[s]atisfied that LEI had concluded a binding outputs contract with [that customer] to begin in the latter half of '99 to extend through fiscal year '04, [the expert] felt justified to project a very substantial jump in pro forma soil amendment revenues through 12/31/04." In addition, LEI cites this court to that section of its expert's valuation report disclosing that the valuation took into account the fact that "management stated that [LEI] had negotiated an oral agreement with [a company] to purchase [LEI's] existing stockpile of organic soil."

LEI's expert considered the abandoned processed soil product in the valuation of LEI at approximately $1.6 million, and LEI has failed to cite evidentiary support for the difference between that amount and the jury's award of $2,528,942.21. We find none. In light of the evidence, the jury's award is so flagrantly excessive that it creates a clear implication of bias, prejudice, or gross mistake by the jurors. The judgment is reversed, and the case remanded for retrial on the issue of damages only.[19]

## Case No. A04A1837

5. LEI contends that the trial court erred in denying it prejudgment interest. The record shows that LEI argued below that it was entitled to prejudgment interest "pursuant to OCGA § 32-3-19 (c)"[20] and as part of its "just and adequate compensation" under the Eminent Domain Paragraph of the Georgia Constitution.[21]

In ruling that LEI was not entitled to prejudgment interest, the trial court determined that OCGA § 32-3-19 (c) was inapplicable because it applied only to takings for transportation purposes. The trial court further determined that LEI's damages could not have been ascertained at the time of the loss, that LEI's damages were thus

---

[19] See *Ga. Northeastern R.*, supra at 246-247; compare *Brock v. Douglas Kohoutek, L.P.*, 225 Ga. App. 104, 109 (3) (483 SE2d 342) (1997) (evidence amply authorized damages award).

[20] After just and adequate compensation has been ascertained and established by judgment, the judgment shall include, as part of the just and adequate compensation awarded, interest from the date of taking to the date of payment pursuant to final judgment at the rate of 7 percent per annum on the amount awarded by final judgment as the value of the property as of the date of taking.

[21] Ga. Const. of 1983, Art. I, Sec. III, Par. I.

unliquidated, and that Georgia law does not allow prejudgment interest on unliquidated damages.

On appeal, LEI does not pursue its argument that OCGA § 32-3-19 (c) entitles it to prejudgment interest. Rather, it maintains that it is entitled to prejudgment interest as part of "just and adequate compensation" under the Eminent Domain Paragraph of the Georgia Constitution. In *Dept. of Transp. v. Consolidated Equities Corp.*,[22] this court answered the question "whether pre-judgment interest is to be included as a portion of 'just and adequate compensation'" contemplated by the Eminent Domain Paragraph[23] in the negative.[24]

LEI also urges on appeal for the first time that "not granting prejudgment interest in inverse condemnation cases where such is awarded in straight condemnation cases for 'transportation' purposes would . . . cast a constitution shadow over OCGA § 32-3-19 (c) under the Equal Protection Clause. . . ." LEI has not shown that this constitutional challenge was made below. "[W]e will not consider errors, even those of constitutional magnitude, unless they were raised and ruled on in the trial court."[25]

### Case No. A04A1838

6. The City contends that it could not be charged with knowledge that its Perry Boulevard sewer caused the alleged contamination. Our ruling in Division 1 of this opinion disposes of this contention adversely to the City.

7. Citing *Ga. Northeastern R. v. Lusk*,[26] the City contends that Yardum was awarded an impermissible double recovery of damages by receiving compensation for lost rent and for the cost of restoring the Property. In *Lusk*, the Court held that "a plaintiff is not entitled to an award of both the diminution in market value and costs to restore for the same injury occasioned by the same trespass and nuisance."[27] The City's argument that diminution in market value is equivalent to lost rent and that therefore Yardum should not have received damages for lost rent in addition to damages for restoring the Property is without merit.

---

[22] 181 Ga. App. 672 (353 SE2d 603) (1987).

[23] Id. at 677 (2).

[24] Id. at 678.

[25] (Citation and punctuation omitted.) *Frank v. State of Ga.*, 257 Ga. App. 164, 167 (3) (570 SE2d 613) (2002); see generally *Designs Unlimited v. Rodriguez*, 267 Ga. App. 847 (601 SE2d 381) (2004).

[26] Supra.

[27] Id. at 246 (1).

*Lusk* involved a nuisance that caused irreparable loss of land for which the landowner sought, among other things, the diminution in fair market value.[28]

> In cases of nuisances which cause permanent injury to land, the ordinary rule is that the measure of damages is the depreciation in the market value; in regard to nuisances which are of a non-permanent, abatable, or temporary nature, the depreciation in the usable or rental value ordinarily furnishes the measure. But, under some circumstances, there may also be a recovery for special damages.[29]

Unlike the circumstances in *Lusk*, Yardum claimed that the City had been maintaining an abatable nuisance. As to that harm, she did not seek damages for diminution in fair market value; rather, she sought to be compensated for lost rent. In addition, she sought to be compensated for the costs to remediate the contamination she alleged that the City had caused, the costs of various other expenses she incurred due to the City's conduct, and for emotional distress.

The jury was authorized to award Yardum damages for lost rent in addition to the costs of restoring the Property.[30] Accordingly, this contention is without merit.

8. The City contends that the trial court erred in excluding as irrelevant certain correspondence related to the Property being listed on the July 1, 1999 HSI due to metal contamination. Yardum argued at trial that the letters were not relevant because her claims were based upon the City's fecal coliform contamination of the Property. The City countered that the documents showed that the City was not solely responsible for the diminution of the Property's value.[31]

As stated in Division 7,[32] Yardum's theories of recovery did not include diminution of the Property's value. Furthermore, although

---

[28] Id.

[29] (Citations omitted.) *Central Ga. Power Co. v. Pope*, 141 Ga. 186 (2) (80 SE 642) (1913); see also *City of Columbus v. Myszka*, 246 Ga. 571, 573 (6) (272 SE2d 302) (1980); *City of Warner Robins v. Holt*, 220 Ga. App. 794, 796 (2) (470 SE2d 238) (1996).

[30] See *City of Gainesville v. Waters*, 258 Ga. App. 555, 558 (2) (574 SE2d 638) (2002).

[31] The City also argues on appeal that the documents established that Yardum's alleged emotional distress was caused, in part or in whole, by the EPD's involvement with the Property relative to the metal contamination. But the City fails to show where it made this argument below. "[T]he scope of review is limited to the scope of the ruling in the trial court as shown by the trial record and cannot be enlarged or transformed through a process of switching or shifting." (Citation and punctuation omitted.) *Luxenberg v. Griffith*, 237 Ga. App. 201, 202 (1) (514 SE2d 63) (1999). Moreover, the City fails to cite a ruling by the trial court that precluded it from *arguing* that the EPD's concern about the Property's metal contamination was responsible for Yardum's emotional distress.

[32] Supra.

the correspondence was not admitted in evidence, other evidence showed that from 1970 to 1998, Yardum leased the Property to companies engaged in the business of grinding cars and that the Property was listed on the HSI due to metal contamination. And the jury heard the testimony of Yardum's expert real estate appraiser that he had considered the metal contamination in valuating Yardum's lease with LEI. Under these circumstances, we find no abuse of discretion in the trial court's exclusion of the correspondence.[33]

9. Citing OCGA § 36-33-5 (b) and the *City of Chamblee v. Maxwell*,[34] the City argues that the trial court erred in permitting Yardum to present evidence of damages related to a period of time after August 27, 1999, the date she presented ante litem notice to the City.

The City points out that OCGA § 36-33-5 (b) requires a plaintiff suing a municipality to provide ante litem notice by presenting a written claim "[w]ithin six months of the happening of the event upon which a claim against a municipal corporation is predicated." The City also cites language in *City of Chamblee v. Maxwell*[35] that "upon giving the six-month notice required by OCGA § 36-33-5, a property owner who incurs damage as a result of a continuing nuisance or trespass maintained by a municipality is entitled . . . to recover *only those damages incurred* during the six months preceding the giving of such notice."[36] The City argues that OCGA § 36-33-5, taken together with the cited language in *Maxwell*, limits Yardum's recovery to damages incurred only between February 27, 1999, and August 27, 1999. It complains that Yardum's expert real estate appraiser included rental amounts for months subsequent to that six-month period and that Yardum's evidence about various other expenses did not establish that they were incurred during that time frame.

In *Maxwell*, the question before the Court was whether a plaintiff could recover damages for events that had occurred more than six months *before* the date of the ante litem notice. Immediately after the language cited here by the City, the Court held, "[t]he recovery of any damages incurred *prior* thereto would be barred, where no timely notice of a claim therefor was given in accordance with the provisions of OCGA § 36-33-5."[37] Because the question of whether damages were available for events that occurred *after* the ante litem notice is given was not before the Court, the City's reliance on *Maxwell* is misplaced. Furthermore, the City's argument is inconsistent with Georgia law

---

[33] See *Mendel*, supra.
[34] 264 Ga. 635 (452 SE2d 488) (1994).
[35] Id. at 637.
[36] (Emphasis supplied.) Id.
[37] (Emphasis supplied.) Id.

on damages attainable in continuing, abatable nuisance actions[38] and is incompatible with the purpose of the statute, which is "to afford city officials the opportunity to take proper steps to abate a continuing nuisance or trespass before the effects thereof become great or far-reaching."[39] Contrary to the City's contention, OCGA § 36-33-5, taken together with *Maxwell*, does not stand for the proposition that a municipality's liability for the effects of a continuing nuisance or trespass is truncated by ante litem notice. The trial court did not err in permitting Yardum to present the contested evidence.

10. The City argues that the trial court erred in failing to exclude as irrelevant the results of sampling conducted at the Property after August 27, 1999. It argues that such results were unrelated to conditions at the Property during the six months preceding that date. Evidence that logically tends to prove or to disprove any material fact at issue in the case is relevant.[40] As this evidence tended to show the levels of contamination caused by the City's unabated nuisance, the trial court properly admitted it.

### Case No. A04A1839

11. Yardum contends that the trial court erred in granting the City's motion for j.n.o.v. as to her award of attorney fees. Yardum sought attorney fees pursuant to OCGA § 13-6-11, claiming that the City had acted in bad faith. In vacating her award, the court determined that there was no evidence that the City had acted in bad faith. Whether there was bad faith is generally for the jury to determine from its consideration of the facts and circumstances in the case.[41] In reviewing the grant of j.n.o.v. with regard to attorney fees, we view the evidence in the light most favorable to the party who obtained the jury verdict, and the standard of review is whether there is any evidence to support the verdict.[42]

Bad faith warranting an award of attorney fees must have arisen out of how the defendant acted in dealing with the plaintiff.[43] In *CSX Transp. v. West*,[44] this court determined that there was some evidence of bad faith where the defendant failed to maintain drainage control

---

[38] See *Central Ga. Power Co.*, supra; *City of Columbus*, supra; *City of Warner Robins*, supra (where nuisance is abatable, the measure of damages includes lost rental value "for so long as the nuisance is allowed to continue").

[39] *Maxwell*, supra.

[40] OCGA § 24-2-1.

[41] *City of Gainesville*, supra at 559 (4).

[42] *Nichols v. Main Street Homes*, 244 Ga. App. 591, 593 (2) (536 SE2d 278) (2000).

[43] *City of Gainesville*, supra; *Nichols*, supra.

[44] 240 Ga. App. 209, 211-212 (3) (a) (523 SE2d 63) (1999).

around its rails despite its knowledge that the plaintiff's property was being flooded as a result. And in *City of Gainesville v. Waters*,[45] we determined that some evidence of bad faith existed where the defendant city refused to alleviate its drainage problems, despite numerous complaints and its knowledge that the plaintiff's property was being flooded as a result of its failure to act.

Construed in favor of Yardum, the evidence amply supported the jury's determination that the City had acted in bad faith. As early as the summer of 1998, the City was notified of "raw sewage feces" floating in a ravine across the street from the Property. By February of the next year, the City was receiving numerous complaints about an odor emitting from the area of the Property. The following month, a City representative went to the Property and met with EPD representatives, but attributed the color of the liquid in a ravine across from the Property to tannin from leaves. In June, a City employee investigating odor complaints happened upon the Property and ultimately blamed LEI for the odor. Later that month, the City's own samplings confirmed that the Property was contaminated by unsafe levels of fecal coliform bacteria. After the geologist hired by Thomas advised City officials of his claim that the City's sewer lines were causing the problem, the City officials responded that they would take the speculative theory into consideration. However, the City conducted no investigation of its sewer lines until ordered to do so by the EPD. And while the City only partially complied with that order, its investigation nonetheless confirmed that its sewer system contained numerous cracks, openings, and separations.

The City asserts that it reasonably responded to the numerous complaints, queries, and requests, citing the efforts made by its employees and the contractor. It also points out that its employees and the contractor all concluded that its sewer lines were not causing the problems at the Property.

Notwithstanding, there was sufficient evidence to support a finding that the City acted in bad faith by refusing to take any action to alleviate damage that it knew or should have known was being caused by its sewer lines. Where there is at least some evidence to support a claim for attorney fees based on bad faith, a reviewing court has no authority to determine or question how the jury resolved any evidentiary conflicts or uncertainties.[46] We conclude that because there was at least some evidence to support the jury's finding that the

---

[45] Supra at 560.
[46] *City of Warner Robins*, supra at 796 (1) (c).

City acted in bad faith, the award of attorney fees should have been upheld.[47]

*Judgment in Case No. A04A1836 reversed and the case remanded with direction. Judgments in Case Nos. A04A1837 and A04A1838 affirmed. Judgment in Case No. A04A1839 reversed. Johnson, P. J., and Smith, P. J., concur.*

DECIDED MARCH 17, 2005 —
RECONSIDERATIONS DENIED APRIL 13, 2005 — 

*Alston & Bird, David M. Meezan, Paul J. Kaplan, Rodney J. Ganske, Linda K. DiSantis, Kendric E. Smith,* for City of Atlanta.

*Eastman & Apolinsky, Stephen D. Apolinsky,* for Landmark Environmental Industries, Inc.

*Drew, Eckl & Farnham, Joseph C. Chancey, Megan G. Mathews,* for Yardum.

---

[47] See *City of Gainesville,* supra at 559-560; *Nichols,* supra; *City of Warner Robins,* supra.