**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER, J., and SENIOR JUDGE FULLER**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**October 2, 2025**

# In the Court of Appeals of Georgia

A25A1198. DEPARTMENT OF TRANSPORTATION v. 5.85 ACRES OF LAND AND CERTAIN EASEMENTS RIGHTS et al.

DILLARD, Presiding Judge.

The Department of Transportation appeals from the judgment entered against it, as well as the denial of its motion for new trial, after a jury awarded $1,500,000 to John Sauls[1] for the condemnation of a portion of his property. More precisely, the DOT argues it is entitled to a new trial because (1) the jury's verdict so far exceeded the estimated property values that it justifies an inference of gross mistake or undue bias, and (2) the trial court abused its discretion when it "engaged in speculative and

---

[1] Appellees include the John W. Sauls Revocable Trust dated February 14, 2005; John W. Sauls, as Trustee of the John W. Sauls Revocable Trust dated February 15, 2005; and John W. Sauls. We refer to these parties collectively as "Sauls."

erroneous reasoning as to the basis for the jury's verdict." For the following reasons, we reverse the trial court's judgment and remand for a new trial.

Viewed in the light most favorable to the jury's verdict,[2] the record shows that in 2018, the DOT condemned 5.85 acres of Sauls's 46.5 acre property—with the condemned portion encompassing the middle of the farm his family had owned for 56 years. And during those years, the Sauls family used the property for church Easter egg hunts, dove fields, rodeos, livestock, horse training, cattle, and hay fields. In contrast, the DOT planned to use the condemned portion of Sauls's property to construct a bypass around the city of Villa Rica. Sauls disagreed with the $37,200 value the DOT offered as just and adequate compensation for the 5.85 acres, and he appealed the condemnation to the Superior Court of Carroll County.

Following trial, a jury ruled in Sauls's favor and awarded damages in the amount of $1,500,000. The DOT moved for a new trial, arguing the award exceeded the value amounts in evidence and requesting that the trial court act as the "thirteenth juror." The trial court denied the motion on both grounds. In doing so, the court

---

[2] *See, e.g.*, *City of Pendergrass v. Rintoul*, 354 Ga. App. 618, 621 (841 SE2d 399) (2020) ("[T]he appellate court must construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict.").

detailed findings the jury *could* have made to reach the awarded amount of $1,500,000.

This appeal follows the trial court's denial of the DOT's motion for new trial.

1. The DOT argues the jury's verdict so far exceeded the values in evidence that it justifies an inference of gross mistake or undue bias. We agree.

Private property rights are among "the most basic of human rights,"[3] and it is the "charge of the courts to defend them vigilantly."[4] A classic taking is one in which "the government directly appropriates private property for its own use."[5] So, when the government seeks to take private property from a citizen to "build roads,

---

[3] William K. Lane III, *"Your Raisins or Your Life": The Harrowing of the Takings Clause in Horne v. U.S. Department of Agriculture, 750 F.3d 1128 (9th Cir. 2014)*, 38 HARV. J. LAW & PUB. POL'Y 761, 761 (2015) (quoting MILTON FRIEDMAN & ROSE D. FRIEDMAN, TWO LUCKY PEOPLE: MEMOIRS 605 (1998)).

[4] *Id.* at 761; *see also* John Locke, *The Second Treatise*, TWO TREATISES OF GOVERNMENT § 124 (Peter Laslett ed., Cambridge Univ. Press 1960) (1698) ("The great and chief end, therefore, of Mens uniting into Commonwealths, and putting themselves under Government, is the Preservation of their Property."); OCGA § 22-1-3 ("It is the province of the General Assembly to determine when the right of eminent domain may be exercised. If, however, under pretext of such necessity the General Assembly should pass a law authorizing the taking of property for private use rather than for public use, the courts should declare the law inoperative.").

[5] *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 (IV) (122 SCt 1465, 152 LE2d 517) (2002) (quoting *E. Enters. v. Apfel*, 524 U.S. 498, 522 (IV) (A) (118 SCt 2131, 141 LE2d 451) (1998)).

courthouses, or other public projects, it must compensate the owner at fair market value."[6] Governmental action that works a taking of private property, then, "necessarily implicates the 'constitutional obligation to pay just compensation.'"[7]

The just-compensation requirement is enshrined in both our federal and state constitutions[8] and "saves individual property owners from bearing public burdens

---

[6] *Sheetz v. Cnty. of El Dorado, California*, 601 U.S. 267, 273-74 (II) (A) (144 SCt 893, 218 LE2d 224) (2024) (Barrett, J.); *see also Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 715 (II) (A) (130 SCt 2592, 177 LE2d 184) (2010) (Scalia, J.) (noting that the "Takings Clause bars the State from taking private property without paying for it, no matter which branch is the instrument of the taking").

[7] *First English Evangelical Lutheran Church of Glendale*, 482 U.S. at 315 (II) (107 SCt 2378, 96 LEd2d 250 (1987) (citation omitted); *see also Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (43 SCt 158, 67 LEd 322) (1922) ("The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.").

[8] *See* GA. CONST. art. I, sec. 3, para. I (noting that "private property shall not be taken or damaged for public purposes without just and adequate compensation being first paid"); U.S. CONST. Amend. V (noting that ". . . nor shall private property be taken for public use, without just compensation"); *see also* OCGA § 22-1-6 ("If a person who is authorized to exercise the power of eminent domain cannot by contract procure the property . . . or other interest sought to be condemned, the person may take or damage the property or interest upon paying or tendering to the owner thereof just and adequate compensation."); *Horne v. Dep't of Agric.*, 576 U.S. 350, 358 (II) (A) (1) (135 SCt 2419, 192 LE2d 388) (2015) (Roberts, C.J.) ("The principle reflected in the [Takings] Clause goes back at least 800 years to [the] Magna Carta . . . ."); Letter from William Pierce to St. George Tucker (Sept. 28, 1787), GAZETTE OF THE STATE

which, in all fairness and justice, should be borne by the public as a whole."[9] For this reason (among others), in condemnation proceedings, the condemnor is "liable not only for direct damages for the actual land taken for the public use," but also for "all consequential damages which naturally and proximately flow from the taking of the land to the remainder of the parcel or tract of land not taken as tend to diminish its market value."[10] And in terms of consequential damages, when there is "evidence to

OF GEORGIA, Mar. 20, 1788, *excerpted in* THURSTON GREENE, THE LANGUAGE OF THE CONSTITUTION 614 (1991) ("I conceive civil liberty is sufficiently guarded when personal security, personal liberty, and private property, are made the peculiar care of government.").

[9] *Sheetz*, 601 U.S. at 274 (citation modified); *accord Armstrong v. United States*, 364 U.S. 40, 49 (80 SCt 1563, 4 LEd2d 1554) (1960).

[10] *Ga. Power Co. v. McCrea*, 46 Ga. App. 279, 230 (1) (167 SE 542) (1933); *see Simon v. Dep't of Transp.*, 245 Ga. 478, 478 (265 SE2d 777) (1980) (holding that there are two elements of damages to be considered in a condemnation proceeding: "first, the market value of the property actually taken; second, the consequential damage that will naturally and proximately arise to the remainder of the owner's property from the taking of the part which is taken and the devoting of it to the purposes for which it is condemned" (punctuation and citation omitted)); *White v. Dep't of Transp.*, 343 Ga. App. 491, 493 (806 SE2d 860) (2017) ("[I]n order for a condemnee to recover consequential damages to the remainder of his property when only a part is taken, it must appear that the damages to the remainder proximately and naturally arose from the condemnation and taking of the condemnee's own property." (emphasis and punctuation omitted)); *Pribeagu v. Gwinnett Cnty.*, 336 Ga. App. 753, 755 (785 SE2d 567) (2016) ("In condemnation actions, only two elements of damages are considered: first, the market value of the property actually taken; second, the consequential

5

show that the land taken will, by intrusion on the general layout of the property, tend to destroy the unity of the farm and thus depreciate the market value of the part not taken, this is a legitimate subject for consideration in determining the amount of consequential damages."[11]

Importantly, the question of damages cannot be "left to speculation; conjecture and guesswork."[12] As a result, when a party "seeks additional damages he has the burden of proof of showing the amount of loss in a manner from which the jury . . . can

damage that will naturally and proximately arise to the remainder of the owner's property from the taking of the part which is taken and the devoting of it to the purposes for which it is condemned." (punctuation omitted)).

[11] *Dep't of Transp. v. Brown*, 155 Ga. App. 622, 623 (2) (271 SE2d 876) (1980); *see Pribeagu*, 336 Ga. App. at 755 (explaining that consequential damages are "the difference between the fair market value of the remaining property prior to the taking and the fair market value of the remaining property after the taking").

[12] *Dep't of Transp. v. McLaughlin*, 163 Ga. App. 1, 5 (4) (292 SE2d 435) (1982) (punctuation omitted), *overruled on other grounds by White v. Fulton Cnty.*, 264 Ga. 393 (444 SE2d 734) (1994).

calculate the amount of the loss with a reasonable degree of certainty."[13] To that end, the value awarded should be within the range of evidence presented by the parties.[14]

A property's market value is a matter of opinion and "may be established by direct as well as circumstantial evidence," and it must be determined through a jury's resolution.[15] Significantly, the jury is not bound "even by uncontradicted testimony of experts," but may also consider the "nature of the property involved, together with any other fact or circumstance properly within [its] knowledge . . . which tends to establish the value of the property, and [it] may arrive at a different figure than that

---

[13] *McLaughlin*, 163 Ga. App. at 5 (4) (punctuation omitted), *overruled on other grounds by White*, 264 Ga. 393; *see Postal Tel. Cable Co. v. Peyton*, 124 Ga. 746, 746 (52 SE 803) (1906) ("A jury cannot be left to roam without any evidence in the ascertainment and assessment of damages.").

[14] *See Dep't of Transp. v. Brooks*, 153 Ga. App. 386, 387 (1) (265 SE2d 610) (1980) (explaining that "[e]stimates of the value of the property taken and consequential damages ranged from $7,750 to $22,950 and $26,000," and thus "the verdict for $21,460 was well within the range of evidence" and was not "excessive or exorbitant as a matter of law"); *City of Jefferson v. Maddox*, 116 Ga. App. 51, 56 (6) (156 SE2d 553) (1967) ("A value finding in a condemnation case will not be set aside as inadequate or excessive where it is within the range of the evidence." (punctuation omitted)); *State Highway Dep't v. Whitehurst*, 106 Ga. App. 532, 535 (4) (127 SE2d 501) (1962) (holding that jury's verdict was not excessive when it was "within the range of the evidence").

[15] *Dep't of Transp. v. Driggers*, 150 Ga. App. 270, 274 (257 SE2d 294) (1979).

of the experts, higher or lower . . . ."[16] Still, that higher or lower value may not be "so disparate as to justify an inference of gross mistake or undue bias."[17]

Here, multiple experts testified about the value of Sauls's property. First, an expert appraiser testified on behalf of the DOT. He inspected the property in February 2019 and valued it as of April 12, 2018—the day the DOT filed its condemnation petition. In reaching his opinion as to the property's fair market value, he first determined its "highest and best use," which he opined was as residential property; and he then used the sales-comparison approach to valuation.[18] The expert appraiser ultimately valued the portion of property the DOT condemned at $60,000, and he also determined that the northern portion of property Sauls retained was negatively impacted by the taking.[19] He valued the negative impact to Sauls's property

---

[16] *Id.*; *accord Dep't of Transp. v. Brannan*, 278 Ga. App. 717, 718 (629 SE2d 481) (2006).

[17] *Driggers*, 150 Ga. App. at 274; *see City of Pendergrass v. Rintoul*, 354 Ga. App. 618, 627 (3) (841 SE2d 399) (2020) ("Even though the evidence is such to authorize a greater or less[er] award than that actually made, the appellate court will not disturb it unless it is so flagrant as to shock the conscience." (punctuation omitted)).

[18] This approach looks to the sale prices for comparable properties to reach an estimated value for the subject property.

[19] The expert testified that the southern portion of the land maintained a higher value, but the northern portion was in a flood plain. Thus, in effect, the DOT's taking

at approximately $80,000 in consequential damages, for a total amount of just under $140,000.[20] More precisely, he found consequential damages in the amount of $78,050, for a total recommended payment to Sauls of $137,600.

Sauls also testified about the taking of his land and he did so in stark terms. He believed the DOT's taking "destroyed" his property, and that when the bypass was complete, it would run approximately 100 yards from his house. In Sauls's view, by splitting his property into two halves, he could no longer easily maintain the land by simply driving a tractor from one end to the other, but he would now need to drive a tractor down the road to reach the other half of his property—which he described as "endanger[ing] [his] life." Ultimately, Sauls valued the 5.85 acres taken at $400,000 (not including consequential damages), which he said was based on a certified property appraiser's value.[21]

---

separated the "bad" northern land from the "good" southern land, and the expert opined that there was not much Sauls could do with the bad northern land.

[20] He valued the entirety of the land at $562,775.

[21] As a result of the condemnation, Sauls was forced to refinance the land or face foreclosure on a loan secured by it. Prior to refinancing, he had to pay his bank's legal fees, which were nearly $9,000 as a result of the condemnation action. And due to refinancing, he had to pay $5,000 in closing fees. He also went from a 2.88 percent interest rate on his loan up to 6.25 percent. Even so, just and adequate compensation

The certified property appraiser also testified about the subject property's value as of the date of condemnation. In considering the property's highest and best use, she looked to similar properties purchased for "future development" as the City of Villa Rica looked to update its land-use map. And in doing so, she concluded the highest and best use for Sauls's property would be to "hold for future development";[22] and she then used the sales-comparison approach to reach its value. The appraiser calculated values based on residential use, "hold for development," and commercial use. She then applied the "hold for future development" value of $40,000 per acre to Sauls's 27 northern acres and the commercial-use value of $90,000 per acre to his 19 southern acres. This led to her overall calculated per-acre rate of $60,000. She then reached a value of $355,000 for the 5.85 acres taken by the DOT and $15,000 for a temporary Georgia Power easement. Altogether, she reached a valuation of $370,000

for consequential damage "must be based upon the value of the remaining property and not upon the problematical utilization or loss of a financing agreement which happens to be related to the land." *Canada W., Ltd. v. City of Atlanta*, 169 Ga. App. 907, 909 (1) (315 SE2d 442) (1984).

[22] The certified appraiser testified that, as of November 2018, under the City's then-adopted land-use map, Sauls's "bad" northern land was considered appropriate for "suburban village" (*i.e.*, low-density mixed use for offices and townhomes) and the "good" southern land was considered appropriate for "medical" (*i.e.*, low-density commercial offices).

for the property that was taken.[23] She did *not* calculate a value for consequential damages.

Next, a civil engineer—who is also Sauls's grandson—testified about the property's diminished value as a result of the bypass construction. He noted that—for purposes of future development—Sauls's property would now require two hydrology studies as opposed to one because the land was cut into two portions. Additionally, he testified that the property division decreased options for stormwater management because two systems would be required. And in his view, grading work on the property would be more difficult because off-road dump trucks could no longer move dirt from one side of the land to the other; instead, more trips would be required using road-safe vehicles. Also, to build the roadway, the DOT blasted through bedrock; and so, future development projects would need to conduct additional studies into the impact of the blasting to ensure building stability. But in the end, Sauls's grandson did not assign a dollar amount to *any* of his testimony.

Sauls also presented the testimony of a licensed commercial real estate broker, who is also his daughter-in-law. She testified as to the value of the 5.85 acres taken by

---

[23] The certified appraiser valued the entirety of the property—*before* the condemnation—at $2,855,000.

the DOT and how the property's overall value was impacted by the taking, each as of the time of condemnation. In her opinion, the highest and best use for the property was for medical offices, and she then used the sales-comparison approach to calculate its value. In doing so, she reached a value of $90,000 per acre for a total of $526,500 for the 5.85 acres the DOT condemned.

Sauls's daughter-in-law also gave an opinion as to the amount of consequential damages to the property. She estimated that there would be a 50-foot setback from the road that Sauls would still own but be unable to develop; but she did not include this in her value estimation. Ultimately, she concluded that the consequential damages to the remaining property amounted to $445,600. So, in total, she valued Sauls's overall damages at $972,100.[24]

Based on the above, the DOT contends the jury's verdict of $1,500,000 far exceeded the property values in evidence, including consequential damages. We agree. Even so, Sauls—and the trial court—seek to justify this award by considering the possibility that the jury applied a cost of $124,565 per acre (the highest comparable sale amount used by an expert). But even assuming the jury applied that amount per

---

[24] Sauls's daughter-in-law valued the entirety of the property as being worth $3,057,500 *before* the DOT's taking.

acre, the 5.85 acres taken would only equal $728,705.25. As a result, Sauls and the trial court further speculated that the jury included the 50-foot setback in the award. But the expert who testified about the 50-foot setback did not assign a value to it, nor was she certain about the actual size of the setback. Instead, she testified as follows: "I think in this case, [the setback will] probably [be] roughly 50 foot [sic] onto this private property that he's still paying taxes on, that he can't put a building on. But, that's not in my numbers. My numbers are conservative and to the point."

As for consequential damages, we have "consistently given juries considerable latitude in awarding [them] in condemnation cases [when] there is evidence of the fact and amount of diminution in value to the remainder as a result of the taking."[25] But here, the highest estimated value in evidence as to consequential damages was $445,600. So, adding that amount to $728,705.25 results in a total of $1,174,305.25 in damages with $325,694.75 unaccounted for by the evidence. And while Sauls's grandson provided expert testimony regarding additional steps that would be necessary for future development, he did not give a monetary value—or a way to calculate such a value—for consequential damages. As a result, his testimony was

---

[25] *Dep't of Transp. v. Gramson Props.*, 167 Ga. App. 18, 18 (306 SE2d 29) (1983).

insufficient to support an upward deviation of more than $300,000.[26] Any upward

deviation for consequential damages in the amount of $325,694.75, then, is simply

unsupported by evidence.

In sum, there is no way to reconcile the jury's award of $1,500,000 with the

evidence presented below without engaging in speculation—which is forbidden.[27] We

---

[26] *See Dep't of Transp. v. Morris*, 263 Ga. App. 606, 608 (1) (588 SE2d 773) (2003) (explaining that "[e]vidence of damage to the fence as a result of the taking may be considered a factor in establishing the reduced fair market value of the remaining property after the taking, but it was not a substitute for evidence of property value and was insufficient to establish the amount of consequential damages"). *Cf. Dep't of Transp. v. Ogburn Hardware & Supply, Inc.*, 273 Ga. App. 124, 127 (1) (614 SE2d 108) (2005) (explaining that testimony was sufficient to establish the amount of consequential damages when "the appraiser used the cost to cure as an important factor in reaching his conclusion as to the value of the remainder after the taking and thus in determining the consequential damages").

[27] *See City of Atlanta v. Landmark Env't Indus., Inc.*, 272 Ga. App. 732, 739 (4) (613 SE2d 131) (2005) (holding that jury award could not be affirmed when justifications on appeal were "mere speculation and wholly unsupported by any evidence that . . . provides a reliable basis for calculating the market value"); *Mun. Elec. Auth. of Ga. v. Anglin*, 180 Ga. App. 600, 600 (349 SE2d 546) (1986) (holding that award of $9,000 in damages was excessive in light of testimony that property was worth $2,050 with no consequential damages, and doing so despite evidence of "(a) a description of the subject property and the particular project by a transportation engineer employed by appellant; (b) photographs and a plat of the property; (c) a recitation and analysis of the comparable properties utilized by appellant's expert witness in arriving at his opinion of the value of the subject property; and (d) appellee's own testimony that his remaining property was, in fact, worth less after the taking than prior to the taking"). *Cf. Ideal Leasing Servs., Inc. v. Whitfield Cnty.*, 254

14

are constrained, then, to conclude the award is so excessive as to justify an inference of gross mistake or undue bias on the part of the jury, and the trial court's judgment must be vacated and the case remanded for retrial as to damages.

2. Because we conclude that a new trial is necessary for the reasons given in Division 1, we need not address the DOT's contention that the trial court abused its discretion when it "engaged in speculative and erroneous reasoning as to the basis for the jury's verdict."

For all these reasons, we reverse the trial court's judgment and remand this case for a new trial.

*Judgment reversed and case remanded. Mercier, J., and Senior Judge C. Andrew Fuller, concur.*

---

Ga. App. 397, 400 (562 SE2d 790) (2002) (concluding that jury could have reached award of $160,000, despite an expert's testimony that total damages were valued at $120,000, by combining one witness's valuation of the property with another witness's valuation of consequential damages).