## A07A1851. CITY OF ATLANTA v. WH SMITH AIRPORT SERVICES, INC. et al.
### (659 SE2d 426)

BERNES, Judge.

In this breach of contract suit arising out of the September 11, 2001 terrorist attacks and the resulting permanent security measures imposed at the Atlanta airport, the City of Atlanta appeals from the final order and judgment entered in favor of appellees WH Smith Airport Services, Inc., Airport Management Services, LLC, and Hartsfield Air Ventures ("HAV"). The City contends that it is entitled to a new trial because there was insufficient evidence to support the jury verdict. We disagree and therefore affirm.

> If a jury has returned a verdict, which has been approved by the trial judge, then the same must be affirmed on appeal if there is any evidence to support it as the jurors are the sole and exclusive judges of the weight and credit given the evidence. The appellate court must construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict. As long as there is some evidence to support the verdict, [the verdict will be upheld on appeal].

(Footnote omitted.) *Dailey v. Echols*, 265 Ga. App. 459, 460 (594 SE2d 658) (2004). See also *Dumas & Assoc. v. Nalecz*, 249 Ga. App. 662, 663 (549 SE2d 730) (2001).

With these principles in mind, we turn to the record in the present case. The City of Atlanta owns the Hartsfield-Jackson Atlanta International Airport (the "Airport"). In April 1995, HAV entered into a lease with the City under which HAV agreed to lease retail concessions space at the Airport located in Concourse A and the Atrium, the lobby area prior to the main security checkpoint (the "Lease").[1] The Lease subsequently was amended twice and was set to expire in April 2007. Under the Lease, HAV's annual rental obligation owed to the City was based on either a percentage of annual gross revenues from the concession operations or a minimum annual guarantee, whichever was greater. Significantly, however, Section 11

---

[1] HAV is a general partnership. WH Smith Airport Services, Inc. was the managing partner of HAV until late 2003. In that year, WH Smith with the City's approval assigned its partnership interest to Airport Management Services, LLC. As part of the assignment agreement, WH Smith agreed to indemnify Airport Management for a portion of HAV's rent obligations under the Lease until the end of the Lease term.

of the Lease, "Suspension and Abatement," provided for an abatement of rent under certain defined circumstances. Specifically, Section 11 stated in relevant part:

> If the number of enplanements from Concourse A is severely restricted for longer than seven (7) days by action of the United States of America or the State of Georgia, resulting in material adverse effect on Landlord [the City] or Tenant [HAV], either party hereto shall have the right, upon written notice to the other, to a suspension of this Agreement and an abatement of a just proportion of the services and facilities to be afforded hereunder, or a just proportion of the rental to become due hereunder from the time of such notice until such restriction shall have been removed; provided, however, after a suspension and abatement are properly implemented pursuant to this Section, Landlord shall determine, unilaterally and in good faith, the date when the suspension and abatement ends, and provide notice of such date to Tenant in writing. . . .

A separate provision in the Lease defined "enplanements" as the "[t]otal number of domestic revenue passengers boarding airline carriers."

Following the September 11, 2001 terrorist attacks, the federal government imposed far reaching security mandates on airports and air travel throughout the nation. On September 26, 2001, HAV sent written notice to the City that it was invoking its right to rent abatement under Section 11 of the Lease. In the letter, HAV asserted that the security measures recently imposed at the Airport had severely restricted the number of enplanements in Concourse A, causing a material adverse effect upon HAV's retail sales in the Atrium and triggering the relief afforded by Section 11. The City, however, would not agree to an abatement in the rent. For several years thereafter, HAV continued to argue that the security measures were adversely affecting its Atrium retail sales and continued to seek a rent abatement from the City, but to no avail. Ultimately, appellees brought the instant action against the City for breach of contract, contending that the City had breached Section 11 of the Lease by failing to provide an abatement in rent.[2]

---

[2] Appellees also asserted a breach of contract claim predicated on another section of the Lease, as well as claims for inverse condemnation and constructive eviction. Appellees voluntarily dismissed their claims for inverse condemnation and constructive eviction, and the trial court granted a directed verdict on the other contract claim. None of these claims is at issue on appeal.

A multi-day jury trial followed. During the trial, the trial court ruled that Section 11 was ambiguous and that its meaning could not be resolved through the rules of contract construction, allowed the parties to introduce parol testimony to support their respective interpretations, instructed the jury on contract ambiguity, and instructed the jury that it was to resolve what the ambiguous language meant and what the parties intended. After hearing the combined evidence, the jury returned a verdict in favor of appellees in the amount of $3,288,083. The trial court thereafter entered its final order and judgment on the jury verdict.

Although the City lists six separate enumerations of error in its appellate brief, the City's sole argument on appeal is that there was insufficient evidence to support the jury verdict. Moreover, in discussing the sufficiency of the evidence, the City focuses almost exclusively on the testimony of appellees' expert witness. However, we conclude that, even excluding the testimony of appellees' expert, there clearly was some evidence to support the jury's verdict in favor of appellees.

1. *Interpretation of Section 11.* As an initial matter, we note that the City does not challenge on appeal the trial court's ruling that Section 11 was ambiguous and that the jury had to resolve the ambiguity and determine the intent of the parties through parol evidence. We therefore presume that the trial court's ruling on this issue was correct. See *Jones v. First Nat. Bank of Atlanta,* 147 Ga. App. 441 (249 SE2d 154) (1978). Accordingly, the sole question on appeal regarding how to interpret Section 11 is whether there was any evidence introduced at trial that supported the appellees' interpretation of the section. See *Investment Properties Co. v. Watson,* 278 Ga. App. 81, 83-84 (1) (628 SE2d 155) (2006); *Riviera Equip. v. Omega Equip. Corp.,* 155 Ga. App. 522, 523 (2), 523-524 (3) (271 SE2d 662) (1980). We conclude that there was.

In support of their interpretation of Section 11, appellees elicited parol testimony that the parties understood that the section had two parts, a "trigger clause" at the beginning of the section, followed by a separate part that set out how to determine the length of the resulting abatement period. Specifically, the president of WH Smith testified that the parties intended for Section 11 to be triggered when government security measures severely reduced the number of enplanements at Concourse A for longer than seven days, thereby causing material harm to HAV's retail business in the Atrium. He further testified that the parties intended for the resulting rent abatement period to end only when both the government-mandated security measures were removed, and the City gave HAV written notice that the rent abatement period had ended. The deputy general manager of the City's Department of Aviation, the second highest City official at

the Airport, confirmed this interpretation of Section 11. Given this testimony, the jury was authorized to resolve the ambiguity in Section 11 by adopting the interpretation of the section favored by appellees. See *Investment Properties Co.*, 278 Ga. App. at 84 (1); *Riviera Equip.*, 155 Ga. App. at 523 (2).

2. *The Trigger Clause.* The jury likewise was entitled to find that HAV's right to rent abatement had been triggered following the September 11, 2001 terrorist attacks. As noted, under appellees' interpretation, the right to abatement was triggered when (a) government security measures severely reduced the number of enplanements at Concourse A for longer than seven days, which (b) caused material harm to HAV's retail business in the Atrium. There was evidence that both requirements were met here.

(a) *Reduction in Enplanements.* Appellees elicited testimony from the director of operations for the City's Department of Aviation that immediately following the terrorist attacks, the federal government imposed far reaching security measures on all domestic airports, which included grounding all passenger flights for two-and-a-half days. According to the director, there were far fewer flights in and out of the Airport for at least eight days after the attacks, due in part to new, more thorough security inspection requirements implemented during that period. Appellees buttressed this testimony through their Exhibit 111, a chart of compiled data showing a drastic drop in the number of persons boarding planes in Concourse A beginning on September 11, 2001 and lasting at least through September 18, 2001. Additional compiled data introduced by appellees in their Exhibit 113 reflected a long-term reduction in the number of persons boarding planes in Concourse A lasting beyond 2004. Accordingly, there was evidence from which the jury could conclude that government security measures imposed on September 11, 2001 severely reduced the number of enplanements at Concourse A for longer than seven days.

(b) *Material Harm to HAV.* According to the president of WH Smith, the security measures imposed after the terrorist attacks included the placement of barricades and rope stanchions in the Atrium to control and restrict the flow of passengers in line for the main security checkpoint, which had the effect of blocking and/or impeding access to many of HAV's stores. He further testified that the rope stanchions and more intensive security screening implemented at the checkpoint led to long lines that snaked through the Atrium, thereby prompting passengers to postpone shopping until they had cleared the checkpoint and reached the concourses. Moreover, as part of the added security measures, HAV was required to remove two of its high volume newsstand stores from the Atrium altogether, and HAV also lost one of its prospective subtenants because of the

negative effect caused by the added security measures. The president of WH Smith testified that following the implementation of these changes in security, sales in the Atrium declined drastically and have been consistently lower since September 11, 2001.

Additionally, appellees introduced business records and public records of the Department of Aviation, and elicited testimony from the Department's concessions manager, confirming that the stores in the Atrium suffered severe financial harm as a result of the new security measures. For example, a "Concessions Monthly Business Report" dated October 2001 stated that as a result of long passenger lines caused by the added security measures, retail stores in the Atrium had experienced a 20.2 percent overall decline in revenues from the prior year. Moreover, the concessions manager testified more broadly that as a result of increased security demands, HAV had experienced a 27 percent reduction in sales from September 2001 to 2004. In light of this testimony and documentary evidence, there plainly was sufficient evidence to support the jury's finding that the government-imposed security measures caused material harm to HAV's retail business in the Atrium.

3. *The Abatement Period.* Similarly, the jury was authorized to find that the abatement period ran at least from September 2001 to 2004, thereby entitling appellees to damages for the failure to abate HAV's rent during that period. As previously pointed out, under appellees' interpretation, the rent abatement period ended only when *both* the government-mandated security measures were removed, *and* the City gave HAV written notice that the rent abatement period had ended. At trial, appellees elicited testimony from the president of WH Smith that the added security measures remain in effect in the Atrium and that the City has never provided written notice that the abatement period has ended. As such, there was evidence to support a finding by the jury that the abatement period ran at least from September 2001 to 2004.

4. *Damages.* Based on the evidence discussed in Divisions 1 and 2, the jury was entitled to conclude that the City breached Section 11 of the Lease by failing to abate a "just proportion" of HAV's rent from September 2001 to 2004. And, there was sufficient evidence to support the jury's award of $3,288,083 in damages for the City's breach of the Lease during that time period. "Where the amount of a verdict is within the range of testimony it will not be disturbed on appeal." *C & S Nat. Bank v. Haskins*, 254 Ga. 131, 136 (2) (327 SE2d 192) (1985). Here, the amount of damages awarded by the jury was within the range of the testimony of the Department of Aviation concessions manager, who had recommended to the City that it abate HAV's rent in varying amounts from 2001 to 2004. Hence, the amount of the verdict was authorized by the evidence.

For these combined reasons, we conclude that, when construed in the light most favorable to the verdict, there was more than sufficient evidence to support the jury's conclusion that the City breached Section 11 of the Lease and its award of damages to appellees in the amount of $3,288,083. Consequently, we affirm the final order and judgment entered in favor of appellees.

*Judgment affirmed. Blackburn, P. J., and Ruffin, J., concur.*

DECIDED MARCH 10, 2008.

*Tamara N. Baines, Robert B. Caput,* for appellant.

*Arnall, Golden & Gregory, Charles T. Huddleston, Henry Chalmers, Sarina M. Russotto, Frank J. Beltran, Douglas V. Chandler,* for appellees.