A10A1598. TURNAGE et al. v. KASPER.

(704 SE2d 842)

DILLARD, Judge.

This case demonstrates the deleterious consequences that flow from neighbors turning the admonition to "love your neighbor as yourself" on its head. Christine E. Kasper sued her neighbors, Mark Turnage and Bryant Daniel Penton (collectively, "Appellants"), for, inter alia, malicious prosecution, intentional infliction of emotional distress, and defamation, after the men had her arrested for aggravated stalking because she had the temerity to walk past them while retrieving her children from their designated bus stop. Kasper spent two weeks in jail before the case was eventually dismissed for lack of probable cause. On a verdict form that set out Kasper's causes of action separately, a Cobb County jury awarded her compensatory damages against the Appellants on every claim, as well as attorney

---

fees, in a verdict totaling $210,500. The trial court then entered judgment on the jury's verdict against the Appellants jointly and severally.[1] This appeal follows.

Appellants argue that the jury's verdict was not supported by the evidence, and that the jury's separate awards of monetary damages to Kasper on her claims for malicious prosecution and intentional infliction of emotional distress constitute an impermissible double recovery. For the reasons noted infra, we affirm the jury's verdict as to all claims against Turnage, and as to the claims of malicious prosecution and intentional infliction of emotional distress against Penton. We are constrained to conclude, however, that the evidence did not justify a finding of liability against Penton for defamation. We, therefore, reverse the defamation judgment against Penton, and remand the case to the trial court for a retrial solely on the issue of damages against Turnage for his defamation of Kasper.

At the outset, we note that while Kasper's claims were limited to only a few specific events, such that the facts underlying her lawsuit are relatively finite in nature, it is necessary to provide a detailed history of the long and tortured relationship between the parties in order to place this case in its proper context.

The backdrop for this unfortunate affair is the Applegate subdivision in Acworth, Georgia, where Kasper, her husband, and their two children resided. Penton and his family lived two doors down from the Kaspers, and the Turnage family lived on a separate street in the same subdivision. Due to the location of their homes, any person coming to or from the Kaspers' residence was forced to pass by the Pentons' house in order to enter or exit the neighborhood.

Although at one time the parties were friendly and socialized together, their relationship began to deteriorate rapidly in early 2005. Kasper and her husband described a neighborhood environment in which their family became the target of derision and harassment. The neighbors, led in large part by Turnage and Penton, formed an Orwellian "neighborhood watch" group that monitored and reported the Kaspers' activities. They retained walkie-talkies to facilitate their communications about the Kasper family, and took it upon themselves to photograph and record the Kaspers as they carried out their daily routines. For example, Penton testified at trial that he took approximately thirty photographs of the Kasper family

---

[1] Appellants do not claim that the trial court erred in failing to instruct the jury to apportion its awards of damages among them according to their respective percentage of fault, as required by OCGA § 51-12-33 (b) and *Cavalier Convenience, Inc. v. Sarvis*, 305 Ga. App. 141 (699 SE2d 104) (2010), and we, therefore, have no occasion to address the apportionment issue.

during a one-month period, and purchased a digital audio recorder for the specific purpose of recording them.

The specific encounter underlying the litigation was preceded by several feuds that erupted in August 2005, some of which are set forth below, and in all of which Turnage and/or Penton participated to varying degrees. On August 12, 2005, the Kaspers' next door neighbor believed that the Kasper children were crossing over on to his property line as they rode a motorbike around their yard. Upon learning of the neighbor's suspicions, Penton gave him wooden stakes and string in order to delineate what he understood his property line to be. Believing the stakes to be a potential hazard to the neighborhood children (including her own), Kasper removed them from her neighbor's yard. This action resulted in a heated verbal altercation between Kasper and the neighbor (involving profanity), during which they got directly in each others' faces and Kasper pushed the neighbor on his chest. The police were called, and Penton (among others) complained about Kasper's behavior, but the police took no action.

The following day, August 13,[2] Kasper and her daughter were riding a motorbike in the neighborhood. As they approached the street in front of Penton's house, a group of teenagers—including Turnage's two daughters—formed a human chain across the road, so that Kasper and her daughter could not pass. Although there were several adults present, including Turnage and Penton, none of them discouraged the teens from obstructing Kasper and her daughter's path. Instead, Kasper was forced to stop and ask the teens to move before they released their arms from one another and let them through. While Kasper and both of Turnage's daughters denied that Kasper's bike touched any of them, one teenager testified that the bike hit his arm and side as it passed. Turnage called the police to report the incident, and Appellants claimed that Kasper struck the teens with her motorbike. The police came, but once again took no action. According to the Appellants, Kasper returned to her home, retrieved her German Sheperd puppy, walked down the street past Turnage and Kasper with her dog in tow, and urged the dog twice to "sic 'em."

Later that same day, Kasper was passing a football in her yard

---

[2] That same day, Appellants claim that Kasper was throwing a football with a young neighborhood boy in front of Penton's house, and that eventually the ball landed in his yard. When Kasper stepped on to Penton's yard to retrieve the ball, Penton demanded that Kasper stay off of his property. In response, Appellants claim that Kasper "got directly in [Penton's] face" and threatened to kick him in a violent manner. Appellants also claim that earlier in the day Kasper sat directly across from Penton's house, and then, in front of his family, hurled insults and derogatory comments at him.

with a neighborhood boy she cared for while his grandmother worked late hours. At some point, the football flew over the boy's head and landed in the street. Moments later, one of the teenage girls who participated in the human-chain incident skated by on her rollerblades, grabbed the football, and then fled toward the end of the street with the ball.[3] When Kasper and the boy went to retrieve the ball, they discovered it cut into two pieces and placed in the gutter, and then saw the teenage culprit sitting in the garage of a nearby residence with several other teenagers and at least one adult. Kasper stood outside the garage and demanded that the girl accompany her to discuss the incident with her parents, but she refused to do so. According to Kasper, she then entered the garage and pulled the girl by the arm in an attempt to escort her home, at which time the girl fell on her rollerblades and began screaming and kicking Kasper. The girl claimed that Kasper grabbed her by the throat, caused her to fall to the ground, and then began hitting her before she responded in kind by kicking Kasper. Eventually, Kasper and the boy left the garage alone. Shortly thereafter, Turnage, Penton, and other neighbors—communicating via walkie-talkies—descended upon the garage and called the police. This time, Kasper was arrested and accused of simple battery and battery, and spent approximately 12 hours in a holding cell before being bailed out by her husband.

The following day, August 14, Turnage, Penton, and Kasper's neighbor, among others, went to the magistrate's office to file warrant applications against Kasper. Specifically, Kasper's neighbor filed a warrant application seeking (again) to have her arrested for assault for pushing his chest during their argument about the stakes in his yard; and Turnage filed a warrant application seeking (again) to have Kasper arrested for aggravated assault for allegedly striking the teenage children with her motorbike and terroristic threats for ordering her puppy to "sic 'em."

On September 8, 2005, the magistrate court held a hearing on the warrant applications filed by Kasper's neighbor and Turnage. Following the hearing, Kasper was arrested on two counts of simple assault based on the motorbike incident. She was released from jail on her own recognizance with certain bond conditions, one of which required that she "stay away, absolutely, directly or indirectly" from her neighbor, Turnage, and any other witnesses to the incidents at issue, which included Penton.

Then, on September 13, Kasper left her home and began walking with her dog up the sidewalk past Penton's house in order to pick up

---

[3] Appellants contend that Kasper yelled crude profanities at the girl and intentionally threw the football at her as she passed by.

her children from their designated bus stop, in accordance with her daily routine.[4] Having noticed that Turnage and Penton were in Penton's yard, and fearing that Kasper or their children would be subjected to harassment, Kasper's husband, who was conducting a work-related conference call, stood watch as Kasper walked to the bus stop. As feared, Turnage and Penton moved into the street and began inching closer to the sidewalk as Kasper approached. It is undisputed that Kasper did not speak to, make any gestures toward, or interact with the men in any way, nor did she leave the sidewalk. As Kasper silently passed by Turnage, he told her to keep the "f**king dog away from me," and then looked over at Penton and exclaimed, "Can you believe this sh*t?" At Turnage's prompting, Penton stepped within three feet of Kasper, and, in a paparazzi-esque fashion, snapped a photograph of her. Penton also recorded the incident with an audio recorder that was concealed in his pocket.[5] Undeterred, Kasper continued on to the bus stop, where Turnage and Penton observed as she called for her children and then walked home with them on the opposite side of the street. Again, Kasper said nothing to the men, and Turnage and Penton testified definitively that Kasper's presence was not threatening, nor did they feel intimidated by her in any way.

After this incident, Kasper contacted the police and advised the responding officer of what had just occurred, and expressed her fear that the Appellants were attempting to set her up in order to make a case that she was violating the conditions of her bond.[6] The officer also spoke to Turnage, who claimed that Kasper's act of walking past the men constituted a violation of her bond. The officer declined to take any action with respect to the incident.

Unsatisfied with the officer's decision not to arrest Kasper, Turnage took a copy of the bond conditions, as well as the photograph and audio recording procured by Penton, to the police station the following day, and demanded that the officer be pulled from his patrol duties to speak with him once again about this matter. Turnage "was adamant" that the officer issue an arrest warrant against Kasper for aggravated stalking, a felony, due to Kasper's failure to "stay away" from the men. Although Penton did not accompany Turnage to the police station, he was aware of Turnage's actions and aided in getting the photograph and audio recording to him for the explicit purpose of having Kasper arrested for aggravated

---

[4] There was not a sidewalk on the opposite side of the street.

[5] The audio recording had been erased by the time of trial, and, therefore, was not presented to the jury.

[6] In this respect, the jury heard testimony about the heavy emotional toll that the constant harassment and fear of arrest were placing on Kasper and her family.

stalking. It is undisputed that, at that time, both Turnage and Penton were aware of and had discussed the fact that Kasper would not be eligible to bond out of jail if she were arrested on an aggravated stalking charge. The officer testified that, though he had no intention of revisiting the incident from the previous day, he swore out an arrest warrant for Kasper following Turnage's demand that he do so. As the affiant on the warrant, the officer averred that Kasper "did intentionally walk her dog within three feet of Mark Turnage, thereby contacting him in violation of the conditions of her bond[.]"

On September 15, 2005, the police went to Kasper's home to execute an arrest warrant against her for aggravated stalking. As a crowd gathered outside of her home to witness the arrest, Penton took pictures and gleefully gave high-fives to others in attendance, while declaring "we got her . . . [s]he is not getting out this time." Kasper was subsequently booked into the general population at the county jail, where they searched her, took her clothing, administered blood tests to rule out syphilis and gonorrhea, and locked her into a bunk room with 60 other women.

A hearing date was originally set for nearly a month later (on October 12), but Kasper's husband retained an attorney who succeeded in having the hearing moved up to September 29. At the hearing, the magistrate concluded that there was no probable cause for aggravated stalking and dismissed the warrant against Kasper. During the trial, Kasper testified about her two-week confinement, describing the deplorable conditions of the jail, as well as the emotional strain her incarceration placed on her and her family. Specifically, Kasper recounted the helplessness and despair she felt while attempting to explain the situation to her crying children as they pleaded with her to come home during their phone calls. Kasper also testified as to the sheer terror she experienced upon learning that her husband was being subjected to similar harassment at the hands of the Appellants, such that he had resorted to calling for a police escort when he mowed the lawn or walked his dog out of fear that he too would be arrested and taken from their children.

While Kasper was in jail, Turnage told a neighbor—the grandmother of the young boy who frequently stayed at the Kasper home—that it was a "well known fact" that Kasper was a "drug user[ ]"; that she drank constantly, beginning as early as 9:00 a.m.; that she was "bipolar" and "not stable"; that she needed to "seek professional help"; and that she intentionally put her children up to mischief. This conversation was recorded and played for the jury. Kasper also presented expert testimony from a certified addiction counselor, who testified that an evaluation performed on Kasper after her arrest showed no evidence of ongoing substance or alcohol

abuse, nor any sign of chronic anger issues or violent tendencies. The therapist declined to recommend Kasper for treatment of any kind.

Kasper filed the instant lawsuit, seeking compensatory damages against both Turnage and Penton for malicious prosecution, intentional infliction of emotional distress, and defamation, as well as punitive damages and attorney fees. After hearing the evidence, the jury found in favor of Kasper against both Appellants in the amount of $94,750 on her claim for malicious prosecution; $75,800 on her claim for intentional infliction of emotional distress; $18,950 on her claim for defamation; and $21,000 in attorney fees. The jury declined to award Kasper punitive damages. The trial court then entered judgment on the jury's verdict, and subsequently denied the Appellants' joint motion for judgment notwithstanding the verdict, or, in the alternative, a new trial. This appeal follows.

1. Appellants contend that the trial court erred in denying their motion for directed verdict and/or motion for judgment notwithstanding the verdict and entering judgment on the jury's verdict. Specifically, they assert (a) that there was no evidence from which to conclude that they conspired to commit the tort of malicious prosecution, because the decision to arrest Kasper was made in the independent judgment of the officer, and further that the evidence did not establish a complete lack of probable cause; (b) that the evidence failed to show conduct of an egregious nature sufficient to support a claim that they conspired to intentionally inflict emotional distress upon Kasper; and (c) that Kasper cannot recover for the defamation because she did not prove special damages, Turnage's interaction with the neighbor constituted an "invited" slander, and she failed to prove that Penton conspired to defame her. We will address each of these arguments in turn.

Before doing so, we begin by noting that a trial court's denial of a motion for a directed verdict or judgment notwithstanding the verdict is to be reviewed using the any evidence test, and the evidence is to be construed most favorably toward the party opposing the motion.[7] The question before this Court, then, is not whether the verdict and judgment of the trial court were merely authorized, but whether a contrary judgment was demanded.[8] Put another way, we are required to construe the evidence with every inference and presumption in favor of upholding the verdict, even where the

---

[7] *Certain Underwriters at Lloyd's of London v. Rucker Constr.*, 285 Ga. App. 844, 845-46 (2) (648 SE2d 170) (2007); *see also Lowery v. Roper*, 293 Ga. App. 243, 244 n.1 (666 SE2d 710) (2008) (same).

[8] *Certain Underwriters at Lloyd's of London*, 285 Ga. App. at 845-46 (2); *see also Lowery*, 293 Ga. App. at 244 n.1.

evidence is in conflict.[9] Indeed, so long as there is some evidence to support the jury's verdict, it must be upheld on appeal.[10] This is because jurors are the sole and exclusive judges of the weight and credit given to evidence presented at trial.[11]

(a) *Civil Conspiracy*. Initially, we note that while Kasper did not maintain a separate action for civil conspiracy, she nonetheless asserted throughout the trial that Turnage and Penton conspired to commit each of the three torts for which they were ultimately found liable. And in Georgia,

> [e]very agreement between two or more persons to accom-plish a[n] . . . unlawful object, or a lawful object by . . . unlawful means, is an unlawful conspiracy, and any person whose rights are injured by acts done in furtherance of such conspiracy has his action at law for redress in damages.[12]

Moreover, the existence of a conspiracy may "be inferred from the nature of the acts done, the relation of the parties, [or] the interests of the alleged conspirators,"[13] and, once proven, "makes any action-able deed by one of the conspirators chargeable to all."[14]

(b) *Malicious Prosecution*. To prevail on her claim for malicious prosecution, Kasper was required to prove that she was subject to "[a] criminal prosecution which [was] carried on maliciously and without any probable cause and which cause[d] [her] damage[,]"[15]

---

[9] *See, e.g., City of Atlanta v. WH Smith Airport Servs.*, 290 Ga. App. 206, 206 (659 SE2d 426) (2008).

[10] *Id.*

[11] *See, e.g., Turner Broad. Sys., Inc. v. McDavid*, 303 Ga. App. 593, 593-594 (693 SE2d 873) (2010).

[12] *NAACP v. Overstreet*, 221 Ga. 16, 20 (1) (a) (142 SE2d 816) (1965) (citations and punctuation omitted); *Alta Anesthesia Ass'n of Ga. v. Gibbons*, 245 Ga. App. 79, 85 (3) (537 SE2d 388) (2000) ("A conspiracy . . . is a combination between two or more persons either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort.") (punctuation and footnote omitted); *see also Ledee v. Devoe*, 250 Ga. App. 15, 20 (4) (549 SE2d 167) (2001) (same).

[13] *Cook v. Robinson*, 216 Ga. 328, 330 (5) (116 SE2d 742) (1960) (punctuation omitted); *see also Prescott v. Carithers*, 158 Ga. App. 366, 367 (1) (280 SE2d 361) (1981) ("It is not necessary to prove an express agreement or compact among the wrongdoers; their common design may be inferred from the nature of the acts done, the relation between them, their mutual interests in the matter, and other circumstances." (citation and punctuation omitted)).

[14] *Cook*, 216 Ga. at 329 (4) (citations omitted); *see also Nw. Plaza v. Ne. Enters.*, 305 Ga. App. 182, 193 (4) (699 SE2d 410) (2010) (same).

[15] OCGA § 51-7-40; *see also Wal-Mart Stores v. Blackford*, 264 Ga. 612, 613 (449 SE2d 293) (1994) ("The gravamen of the complaint is the absence of probable cause on the part of the person instituting the prosecution." (citations omitted)); *Gooch v. Tudor*, 296 Ga. App. 414, 417 (1) (b) (674 SE2d 331) (2009) ("The malice contemplated by law in an action for malicious prosecution . . . may consist in personal spite or in a general disregard of the right consider-ation of mankind[.]" (citation, punctuation and footnote omitted)).

and that the prosecution was instigated by the Appellants.[16]

(i) Appellants contend that they did not instigate Kasper's arrest because the decision to seek a warrant against her was made independently by the arresting officer after conducting his own investigation. It is true, of course, that "[t]he law draws a fine line of demarcation between cases where a party directly or indirectly urges a law enforcement official to begin criminal proceedings and cases where a party merely relays facts to an official who then makes an independent decision to arrest or prosecute."[17] In the former case, there is potential liability for malicious prosecution, whereas in the latter case there is none.[18] It is clear, though, "that initiation of the criminal action need not be expressly directed by the party to be held liable."[19] A distinction must be drawn, then, between actually instigating or procuring the institution of criminal proceedings, and merely providing information to a law enforcement official without in any way attempting to influence his judgment.[20] A person may be held liable for malicious prosecution when he provides information to an investigating officer that he knows to be false, and in doing so unduly influences the authorities to take the complained of actions.[21]

In the case sub judice, there is considerable evidence to support the jury's conclusion that Turnage and Penton conspired together to instigate Kasper's arrest. It is undisputed that both were fully aware of and had discussed the fact that if Kasper were arrested for aggravated stalking she would be ineligible to be released on bond. It is also undisputed that Kasper in no way communicated to or interacted with the men as she passed by them on her way to the bus stop, and that it was Penton who intentionally placed himself in her path in order to take the photograph (although this information was, unsurprisingly, not mentioned to the officer by Turnage or Penton). Moreover, the men admitted that, even if they were unaware of her intentions as she walked past them, they both observed and ultimately realized that her purpose was to retrieve her children from their designated bus stop (for which she had no alternate route), and maintained they were not threatened by her presence. Nevertheless, the men insisted to the officer that Kasper committed the crime of aggravated stalking by her actions. Indeed, unsatisfied that Kasper

---

[16] *See, e.g., Kaiser v. Tara Ford, Inc.,* 248 Ga. App. 481, 486 (1) (a) (546 SE2d 861) (2001).

[17] *Wolf Camera v. Royter,* 253 Ga. App. 254, 257-58 (1) (a) (558 SE2d 797) (2002) (citation and footnote omitted); *see also Vojnovic v. Brants,* 272 Ga. App. 475, 478 (2) (b) (612 SE2d 621) (2005) (same).

[18] *Wolf Camera,* 253 Ga. App. at 257-58; *see also Vojnovic,* 272 Ga. App. at 478 (2) (b).

[19] *Wolf Camera,* 253 Ga. App. at 258 (citation and footnote omitted).

[20] *Id.*

[21] *Id.; see also Vojnovic,* 272 Ga. App. at 478 (2) (b).

was not arrested on the day of the incident, Turnage took it upon himself to go to the police station the following day, with Penton's photograph and audio recording in hand, and "adament[ly]" assert to the officer that he wanted Kasper arrested for aggravated stalking. Finally, as Kasper was being placed in handcuffs, Penton was celebrating, slapping high-fives, and announcing to those in attendance, "we got her" and "[s]he is not getting out this time." These facts were more than sufficient to support the jury's finding that Turnage and Penton together instigated and procured Kasper's arrest.[22]

The fact that the arresting officer testified at trial that the decision to pursue a charge of aggravated stalking against Kasper was made in his individual judgment does not change this result. The officer was operating based upon the photographic and audio evidence provided by Penton in conjunction with Turnage's "very strong[ ]" assertion that it showed Kasper to have committed the crime of aggravated stalking, both of which were misleading when taken out of the contextual reality that Kasper was merely seeking to retrieve her children from their designated bus stop, which she could not do without passing by the location where the Appellants had intentionally injected themselves. Furthermore, the officer admitted that, but for Turnage's prompting, he would have neither revisited nor taken any action as a result of the bus-stop incident. Appellants cannot insulate themselves from liability by disingenuously asserting that the officer acted independently when the facts belie this contention.[23]

(ii) We likewise reject Appellants' assertion that Kasper failed to show that a complete lack of probable cause existed for her arrest. One commits the crime of aggravated stalking if such person "in violation of a bond . . . contacts another person . . . without the consent of the other person for the purpose of harassing and intimidating the other person."[24] Essential to this crime is proof that the alleged perpetrator engages in "a knowing and willful course of conduct directed at a specific person which causes emotional distress

[22] See, e.g., Ashmore v. Foster, 254 Ga. App. 97, 99-100 (1) (a) (561 SE2d 228) (2002) (holding that the evidence supported the jury's conclusion that defendants instigated the prosecution, based in part on solicitor-general's testimony that additional charges against plaintiff were added as the result of a conversation with defendants); Wolf Camera, 253 Ga. App. at 257-58 (1) (a) (concluding that evidence of defendant's request to police that plaintiff be arrested for theft while withholding potentially exculpatory evidence was sufficient to sustain a claim for malicious prosecution); Willis v. Brassell, 220 Ga. App. 348, 350-51 (1) (a) (469 SE2d 733) (1996) (finding malicious-prosecution award supported by evidence that defendant gave officer false and/or misleading information leading to plaintiff's arrest).

[23] See, e.g., Vojnovic, 272 Ga. App. at 478 (2) (b); Willis, 220 Ga. App. at 350-51 (1) (a).

[24] OCGA § 16-5-91 (a).

by placing such person in reasonable fear for such person's safety . . . by establishing a pattern of harassing and intimidating behavior, and which serves no legitimate purpose."[25]

As discussed supra, both Turnage and Penton knew by the time they called the police that Kasper's actions were not directed at them, but rather were motivated by her legitimate need to pick up her children from their designated bus stop. Both men also denied that her presence placed them in fear or intimidated them in any way, and, therefore, they had no reason to believe that her walking past them constituted aggravated stalking. It follows, then, that any argument that probable cause existed for Kasper's arrest is wholly without merit.[26]

(c) *Intentional Infliction of Emotional Distress.* To prevail on her claim of intentional infliction of emotional distress, Kasper was required to prove that the Appellants engaged in intentional or reckless conduct of an extreme and outrageous nature that caused her severe emotional distress.[27] This conduct must "be of such serious import as to naturally give rise to such intense feelings of humiliation, embarrassment, fright or extreme outrage as to cause severe emotional distress."[28] Put another way, a case of intentional infliction of emotional distress is one where, generally speaking, "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"[29] And while some conduct may not rise to the

---

[25] OCGA § 16-5-90 (a) (1); *see also State v. Burke*, 287 Ga. 377, 378-79 (695 SE2d 649) (2010) (noting that "[t]he contact with the victim in violation of the protective order must also be without the consent of the other person for the purpose of harassing and intimidating him," and holding that a single bond violation alone cannot form the basis of the crime of aggravated stalking (citation and punctuation omitted)); *Wright v. State*, 292 Ga. App. 673, 676 (665 SE2d 374) (2008) (reversing defendant's conviction on aggravated stalking in part because there was "no evidence that [the alleged victim] was in reasonable fear for her safety").

[26] Appellants argue further that the trial court erred by allowing the magistrate judge who dismissed the warrant to testify as to her finding that probable cause was lacking. We need not consider the merits of this argument, however, because not only was it waived by Appellants' acquiescence to the admission of the judge's testimony, but the testimony was also cumulative of the evidence already in the record. *See, e.g., Ahmed v. Clark*, 301 Ga. App. 426, 428 (688 SE2d 361) (2009) ("Acquiescence deprives [a party] of the right to complain further." (citation, punctuation and footnote omitted)); *Teems v. Bates*, 300 Ga. App. 70, 79 (3) (684 SE2d 662) (2009) (concluding that the admission of evidence is harmless when cumulative of other evidence admitted without objection).

[27] *See, e.g., Northside Hosp. v. Ruotanen*, 246 Ga. App. 433, 435 (541 SE2d 66) (2000); *Troncalli v. Jones*, 237 Ga. App. 10, 14-15 (3) (514 SE2d 478) (1999).

[28] *Gordon v. Frost*, 193 Ga. App. 517, 521 (1) (388 SE2d 362) (1989) (citation, punctuation and emphasis omitted); *see also Troncalli*, 237 Ga. App. at 15 (3) (noting that "mere tasteless, rude or insulting social conduct will not give rise to such a claim" (citation and punctuation omitted)) .

[29] *Biven Software, Inc. v. Newman*, 222 Ga. App. 112, 114 (1) (473 SE2d 527) (1996) (citation and punctuation omitted).

requisite level of outrageousness and egregiousness as a matter of law,[30] "[o]nce the evidence shows that reasonable persons might find the presence of extreme or outrageous conduct, the jury must find the facts and make its own characterization."[31]

This case was proper for jury resolution, and the evidence supports the jury's finding of liability. Appellants' concerted effort to photograph and instigate Kasper's arrest on felony charges and incarceration without bail—knowing that her intended purpose was to pick up her children from their designated bus stop and that she did nothing to provoke them in any way—could be considered by a jury to be extreme and outrageous conduct.[32] Likewise, the jury could have inferred from the evidence presented that the Appellants' prior conduct and harassment of Kasper resulted in a neighborhood gathering outside of her home on the day of her arrest (during which Penton took pictures, gave high-fives, and declared to those in attendance that "we got her . . . [s]he is not getting out this time"), and that this public humiliation was, in and of itself, sufficient to constitute intentional infliction of emotional distress.[33] Finally, the fact that Kasper was booked into the general jail population, where she spent two weeks incarcerated and away from her husband and two children, would "naturally give rise to such intense feelings of humiliation, embarrassment, fright or extreme outrage as to cause severe emotional distress."[34] It follows, then, that the Appellants'

---

[30] *See, e.g.*, *Biven Software*, 222 Ga. App. at 114 (1) (holding that evidence that employer spoke to employee "in a rude tone and condescending manner, belittled her, was critical of her work, and imposed unreasonable deadlines" was insufficient to support a claim for intentional infliction of emotional distress).

[31] *Gordon*, 193 Ga. App. at 521 (1) (citation omitted); *see also Yarbray v. S. Bell Tel. & Tel. Co.*, 261 Ga. 703, 706 (2) (409 SE2d 835) (1991) (same).

[32] *Wal-Mart Stores v. Johnson*, 249 Ga. App. 84, 87 (3) (547 SE2d 320) (2001) (holding that defendant's insistence that plaintiff be arrested and prosecuted despite having evidence that she did not commit a crime was sufficient to support a claim), *overruled on other grounds*, *Ferrell v. Mikula*, 295 Ga. App. 326 (672 SE2d 7) (2008); *K-Mart Corp. v. Lovett*, 241 Ga. App. 26, 29 (3) (525 SE2d 751) (1999) (same), *abrogated on other grounds*, *Golden Peanut Co. v. Bass*, 249 Ga. App. 224 (547 SE2d 637) (2001); *Gordon*, 193 Ga. App. at 518-22 (1) (concluding that evidence of defendant's "malicious purpose or . . . wanton disregard" of plaintiff's rights when having her arrested supported claim).

[33] *Cf. State Soil & Water Conservation Comm'n v. Stricklett*, 252 Ga. App. 430, 437 (555 SE2d 800) (2001) (demand that homeowners remove recently-constructed residence, despite the existence of lesser remedies and fact that no action had been taken against similar residences encroaching on easements at other dams, which was possibly fueled by political retribution, "could be construed by a jury as reckless conduct of an extreme and outrageous nature which caused [homeowners] severe emotional distress"); *Fleming v. U-Haul Co. of Ga.*, 246 Ga. App. 681, 686 (5) (541 SE2d 75) (2000) (holding that "a rational and impartial jury could decide that it is both atrocious and utterly intolerable in a civilized society for the lessor of a valuable motor vehicle to demand the arrest of its lessee for conversion, simply because the lessee did not return the vehicle to the designated place at the designated time and did not return to claim a cash deposit").

[34] *Gordon*, 193 Ga. App. at 520-21 (1) (emphasis omitted) (concluding that the eight or

conduct surrounding Kasper's arrest showed such "malicious purpose [and] wanton disregard of [Kasper's] rights,"[35] so as to justify the jury's verdict in her favor.

(d) *Defamation*. Under Georgia law, slander or oral defamation is actionable where a party "imput[es] to another a crime punishable by law."[36] Contrary to Appellants' assertion, a statement that wrongfully imputes a crime to another is deemed slanderous per se, from which damages are inferred to flow, and requires no showing of special damages.[37]

(i) Turnage's statement to Kasper's neighbor that Kasper was a known drug user, a claim which Turnage himself admitted that he had no evidence to support, imputed to her a crime punishable by law, and thus alone was sufficient to serve as the basis for her claim of slander per se.[38] Moreover, Kasper not only denied the veracity of Turnage's statement, but she also presented expert testimony supporting her denial.

Turnage's claim that he is immune from liability because Kasper "invited" the slander is likewise without merit. While it is true that there can be no recovery for "invited" defamation,[39] the record does not support Turnage's assertion that Kasper's neighbor engaged him solely for the purpose of inviting his slanderous statements. Although the neighbor told Kasper's husband that she would record any conversations she had with Appellants "if the opportunity came about," Turnage admitted that he first approached and was eager to

---

nine hours plaintiff spent in jail would naturally give rise to those emotions necessary to support a claim); *see also Edwards v. Sabat*, 263 Ga. App. 852, 853 (2) (589 SE2d 618) (2003) (illustrating harassing behavior sufficient to sustain a claim).

[35] *Gordon*, 193 Ga. App. at 521 (1) (citation omitted).

[36] OCGA § 51-5-4 (a) (1).

[37] OCGA § 51-5-4 (b); *Wolff v. Middlebrooks*, 256 Ga. App. 268, 270 (1) (568 SE2d 88) (2002).

[38] OCGA § 51-5-4 (a) (1); *King v. Masson*, 148 Ga. App. 229, 231 (1) (B) (251 SE2d 107) (1978) (affirming jury verdict in favor of plaintiff based upon defendant's slanderous statement that plaintiff was "a dope addict" and "on drugs"); *see also Ferman v. Bailey*, 292 Ga. App. 288, 292 (3) (664 SE2d 285) (2008) (reasoning that defendant's assertion that plaintiff filed a false police report supported a claim for defamation); *Wolff*, 256 Ga. App. at 270 (1) (affirming jury's finding of liability based upon defendant's statement that plaintiff was involved in the crime of adultery or fornication); *Davidson v. Walter*, 93 Ga. App. 290, 293 (2) (91 SE2d 520) (1956) (holding that plaintiff set forth a viable slander action based upon defendant's false statement that plaintiff had committed theft).

[39] *See, e.g., Beck v. Oden*, 64 Ga. App. 407, 411 (13 SE2d 468) (1941) ("Under the maxim 'Volenti non fit injuria' (meaning that to which a person assents is not in law an injury), the plaintiff can not complain where, as here, it is shown that he in fact invited or brought upon himself what he claims is a defamation, made to one who had been placed, as it were, in his own shoes."); *Terrell v. Holmes*, 226 Ga. App. 341, 343-44 (2) (487 SE2d 6) (1997) (applying defense to a claim of slander); *Ga. Power Co. v. Busbin*, 249 Ga. 180, 181 (1) (289 SE2d 514) (1982) (applying defense to a claim of libel); *King*, 148 Ga. App. at 230-31 (1) (A) (applying defense to a claim of slander).

speak with the neighbor about "what [was] going on" with the Kaspers, and was told that she was not interested in speaking with him. It was only after Turnage nearly hit her grandson with a golf cart that she invited him over to discuss that incident, at which time he immediately began the conversation with "[t]his is what I wanted to bring you a while ago," as he handed her a newspaper clipping reporting Kasper's arrest. He then delivered a lengthy tirade disparaging Kasper, during which he interspersed various statements expressing his eagerness and previous efforts to share with her his opinions about Kasper. Under these circumstances, the record belies Turnage's argument that the defamation was invited and supports the jury's finding of liability as to Turnage on Kasper's defamation claim.[40]

(ii) Nevertheless, we agree with Penton that the jury's finding of liability on the claim of defamation cannot be sustained against him. Kasper's claim was based upon the allegation that Penton engaged in a conspiracy with Turnage to slander her. While it is true that a person who has not spoken slanderous words may be held liable for them if they were uttered by another in furtherance of a conspiracy to which he was a party, there must be a showing that (1) both parties were present when the slanderous words were uttered, and (2) the slanderous words spoken by one party was done with the consent of the other party and in furtherance of a common design and purpose.[41]

Here, it is undisputed that Penton was not present when Turnage made the slanderous remarks underlying Kasper's defamation claim. Nor is there any evidence to suggest that Penton directed or consented to Turnage's remarks to the neighbor, or that he actually or tacitly entered into an agreement with Turnage to slander Kasper during the particular incident in question. Thus, although the record is replete with evidence of Penton's general disdain for Kasper, there is no evidence to suggest that he engaged in a conspiracy with Turnage as to the subject encounter. It follows, then, that the trial court erred in denying Penton's motion for directed verdict on the defamation claim against him.[42]

(iii) Moreover, because we are unable to determine what portion of the defamation award the jury intended to impose upon Turnage

---

[40] See OCGA § 51-5-4 (a) (1); *King*, 148 Ga. App. at 231 (1) (B); *see also Ferman*, 292 Ga. App. at 292 (3); *Wolff*, 256 Ga. App. at 270 (1); *Davidson*, 93 Ga. App. at 293.

[41] See, e.g., *Roberts v. Lane*, 210 Ga. App. 10, 11-12 (1) (435 SE2d 227) (1993); *Jordan v. Hancock*, 91 Ga. App. 467, 472 (2) (86 SE2d 11) (1955) (same).

[42] See, e.g., *Roberts*, 210 Ga. App. at 11-12 (1); cf. *Smith v. Trust Co. Bank*, 215 Ga. App. 413, 417 (2) (450 SE2d 866) (1994) (holding that employer is not liable for slanderous utterances of its employees without evidence that the employer expressly directed or authorized its employees to slander plaintiff).

alone, as opposed to the acts or intentions of Penton, we must reverse that portion of the award.[43] Turnage is entitled to a new trial, solely on the issue of damages, as to this claim.

2. Appellants further contend that Kasper's recovery on both her claim for malicious prosecution and intentional infliction of emotional distress constitutes a double recovery.[44] We disagree.

The Georgia Constitution provides that the right to a jury trial in this state "shall remain inviolate,"[45] and we have repeatedly held that a jury verdict is only to be disturbed in extraordinary circumstances (i.e., when there is no evidence to support it).[46] Nevertheless, our state's common law and public policy have "always prohibited a plaintiff from a double recovery of damages."[47] Indeed, a plaintiff is only entitled to one recovery and satisfaction of damages, "because such recovery and satisfaction is deemed to make the plaintiff whole."[48] Thus, if two separate causes of action provide a legal theory for compensating one injury, only one recovery may be obtained by the plaintiff.[49] It is only when the second cause of action entitles the plaintiff to recover for an injury separate and distinct from the injury compensated by the award for the first cause of action—or at least for an additional component of injury not covered by the first cause of action—that additional damages may be awarded by the jury.[50]

In considering whether the jury's separate damage awards for malicious prosecution and intentional infliction of emotional distress constitute a double recovery under Georgia law, we begin by noting that our analysis of this issue is tempered by the well-established (and sacrosanct) principle that "after rendition of a verdict, all the

---

[43] *See, e.g., Roberts*, 210 Ga. App. at 13 (3).

[44] Although Appellants did not object to the form of the verdict at the time it was rendered, the issue of whether a verdict improperly represents a double recovery cannot be waived by failing to raise it in the trial court. *See, e.g., City of Roswell v. Bolton*, 271 Ga. App. 1, 8 (5) (608 SE2d 659) (2004) (recognizing that "a claim that a verdict was an impermissible double recovery as a matter of law is an exception" to the general rule that arguments made for the first time on appeal will not be considered (citations omitted)); *see also Nalley Northside Chevrolet v. Herring*, 215 Ga. App. 185, 188 (5) (450 SE2d 452) (1994) (same).

[45] Ga. Const. Art. I, Sec. I, Par. XI (a).

[46] *See, e.g., First Support Servs., Inc. v. Trevino*, 288 Ga. App. 850, 851 (655 SE2d 627) (2007).

[47] *Ga. Ne. R. Co. v. Lusk*, 277 Ga. 245, 246 (1) (587 SE2d 643) (2003) (citations omitted); *see also Am. S. Ins. Group v. Goldstein*, 291 Ga. App. 1, 6 (2) (a) (660 SE2d 810) (2008) (same).

[48] *Lusk*, 277 Ga. at 246 (1) (citations omitted); *see also Goldstein*, 291 Ga. App. at 6 (2) (a).

[49] *Lusk*, 277 Ga. at 246 (1) ("The different means of measuring damages are not to be so applied as to give double damages for the same thing." (citation and punctuation omitted)); *Munford, Inc. v. Anglin*, 174 Ga. App. 290, 293 (2) (329 SE2d 526) (1985) ("If there is substantial identity of wrong (which necessarily includes identity of the right violated), there is substantial identity of cause of action." (citation and punctuation omitted)).

[50] *Lusk*, 277 Ga. at 246 (1); *Hammond v. City of Warner Robins*, 224 Ga. App. 684, 693 (2) (482 SE2d 422) (1997).

evidence and every presumption and inference arising therefrom, must be construed most favorably towards upholding the verdict."[51] Thus, if it is possible for us to construe the evidence presented at trial in a manner that would allow a reasonable jury to issue separate damage awards for malicious prosecution and intentional infliction of emotional distress, and avoid the finding of a double recovery, it is our duty to do so.[52]

At the outset of our analysis, we note that the scope of our factual inquiry is exceedingly narrow. In casting and prosecuting her claims, Kasper sought damages only for Appellants' conduct during the bus-stop incident and the actions they took in connection with her arrest and incarceration. Her reasons for doing so are understandable. As the factual narrative of this unfortunate and disturbing saga demonstrates, Kasper has also been accused of offensive and inappropriate behavior that is altogether unbecoming. In cabining in the factual parameters of her malicious-prosecution and intentional-infliction-of-emotional distress claims as she did, however, Kasper came perilously close to having them overlap to the point where a double recovery might be presumed.[53]

In any event, the question before us remains the same: Is there any evidence to support the jury's separate damage awards against the Appellants for malicious prosecution and intentional infliction of

---

[51] *Esprit Log & Timber Frame Homes v. Wilcox*, 302 Ga. App. 550, 550 (691 SE2d 344) (2010).

[52] *See, e.g., DeCelles v. Morgan Cleaners & Laundry*, 261 Ga. App. 690, 693 (583 SE2d 462) (2003) (rejecting claim of double recovery, and in doing so reasoning, "[a]lthough the jury could have concluded [plaintiff] was fully compensated by the purchase price for use of its trade name, *there was evidence to the contrary which supported the award of additional compensation* for [defendant's] continuing infringement on the trade name while refusing to comply with the processing agreement. *The evidence must be construed to uphold the jury's verdict*" (emphasis supplied)); *Foxchase, LLLP v. Cliatt*, 254 Ga. App. 239, 242 (5) (562 SE2d 221) (2002) (rejecting claim of double recovery, and in doing so reasoning, "Here, *it is possible to construe the verdicts as properly apportioning damages against the defendants in their various capacities*. Absent any showing to the contrary, we find that the trial court correctly construed the verdict" (emphasis supplied)); *cf. City of Atlanta v. Landmark Envtl. Indus.*, 272 Ga. App. 732, 739-740 (613 SE2d 131) (2005) (holding that jury verdict could not be upheld "[w]ithout the specifics of the jury's calculations," and that prevailing party's attempt to calculate the "market value of the business" were "mere speculation and wholly unsupported by any evidence"); *City of Roswell*, 271 Ga. App. at 9 ("We *can only conclude* that the evidence of diminution of value of [appellee's] property applied to the property as a whole and that the jury's award for diminution in value to [plaintiff's] 'property' also applied to the property as a whole. It follows the jury awarded [plaintiff] damages for the loss in fair market value caused by the flooding of the stream bank as well as the cost to repair his property so as to alleviate the flooding, thus making him twice whole." (emphasis supplied)).

[53] In this respect, it does not help that Kasper seemingly posited inconsistent arguments on appeal. On the one hand, Kasper argues that she only sought damages for the bus-stop incident and the events surrounding her arrest and incarceration, and on the other hand she contends that "[t]he damages for the intentional infliction of emotional distress went beyond the malicious prosecution and *included the behavior of the [Appellants] in ostracizing and continually harassing the Kaspers*." Suffice it to say, Kasper cannot have it both ways.

emotional distress? For the reasons that follow, we believe such evidence exists.

To begin with, the elements of proof required for malicious prosecution and intentional infliction of emotional distress are different. As previously discussed, in order to prevail on a claim for malicious prosecution, a plaintiff must show that the prosecution was (1) criminal in nature, (2) instigated without probable cause, (3) malicious in nature, (4) done pursuant to a valid warrant, accusation, or summons, (5) terminated favorably to the plaintiff, and (6) damaging to the plaintiff.[54] A claim for intentional infliction of emotional distress, on the other hand, requires proof that (1) the defendant's conduct was intentional or reckless, (2) the defendant's conduct was extreme and outrageous, (3) there exists a causal connection between the wrongful conduct and the emotional distress, and (4) the distress was severe.[55]

Nevertheless, it is likewise true, as this case demonstrates, that certain conduct can support both a claim for malicious prosecution and a claim for intentional infliction of emotional distress. Moreover, the torts of malicious prosecution and intentional infliction of emotional distress both provide for the recovery of damages for "emotional distress."[56] For this reason, the jury's separate damage awards for malicious prosecution and intentional infliction of emotional distress can only be upheld if the factual parameters of Kasper's claims demonstrate that she suffered separate and distinct injuries.

In applying the limited set of facts to the foregoing elements of proof, we conclude that there was evidence from which the jury could have found the Appellants liable for the separate and distinct injuries of malicious prosecution and intentional infliction of emotional distress as a result of the events surrounding Kasper's arrest, prosecution, and incarceration.

Specifically, the jury could have concluded that the Appellants committed the tort of malicious prosecution against Kasper due to the following: (1) Turnage's decision to go to the police station the day after the bus-stop incident for the explicit purpose of having Kasper arrested; (2) Turnage demanding that the police officer—who declined the day before to take any action against Kasper—be

---

[54] *See, e.g., Blackford*, 264 Ga. at 613.

[55] *See, e.g., Cook v. Covington Credit of Ga., Inc.*, 290 Ga. App. 825, 827-28 (660 SE2d 855) (2008).

[56] *See Restatement (Second) of Torts* § 670 (1977) ("When the essential elements of a cause of action for malicious prosecution have been established, the plaintiff is entitled to recover damages for (a) the harm to his reputation resulting from the accusation brought against him, and (b) *the emotional distress resulting from the bringing of the proceedings*" (emphasis supplied)).

pulled from his patrol duties to revisit the matter; (3) Turnage adamantly demanding that the officer issue an arrest warrant against Kasper for aggravated stalking; (4) Penton's furnishing of the photograph and audio recording he procured during the bus-stop incident for the explicit purpose of having Kasper arrested; (5) Turnage and Penton's decision to press for Kasper to be arrested for aggravated stalking for walking past them, even after they knew that her purpose in doing so was to pick up her children from their designated bus stop; (6) Turnage and Penton's knowledge and discussion of the fact that Kasper would not be eligible to bond out of jail if she were arrested on an aggravated-stalking charge; (7) the issuance of a warrant for Kasper's arrest; (8) Kasper's subsequent arrest and incarceration; (9) the magistrate's conclusion that there was no probable cause for aggravated stalking and dismissal of the warrant; and (10) Kasper's testimony about the deplorable conditions of the jail during her two-week imprisonment and the severe emotional strain her incarceration placed on her.

And while it is certainly true that the foregoing evidence could also support Kasper's broader claim of intentional infliction of emotional distress (as noted supra), there remains other evidence sufficient to support the jury's separate damage award on this cause of action. Specifically, the jury could have concluded that the Appellants intentionally inflicted emotional distress on Kasper by (1) placing Kasper in fear of being arrested for walking to the bus stop to meet her children by intentionally placing themselves in her path (knowing that she had no alternate route); (2) attempting to provoke Kasper into violating her bond conditions by advancing toward her as she walked (i.e., inching toward the sidewalk as she approached, cursing at her, and taking her photograph in a paparazzi-esque manner)—the result of which would be, and ultimately was, her incarceration; (3) orchestrating (directly or indirectly) the gathering of a crowd outside of Kasper's house during her arrest; (4) encouraging (directly or indirectly) those in attendance to celebrate Kasper's arrest (even though they knew she was innocent and had not committed the crime of aggravated stalking); and (5) participating in the public humiliation of Kasper in front of her neighbors, family, and friends.[57]

In upholding the jury's separate awards for malicious prosecution and intentional infliction of emotional distress, we recognize that the evidence for the former is arguably stronger than the latter. Nonetheless, the jury determined that Kasper was entitled to dam-

---

[57] We note that the Appellants have not raised, and we therefore do not consider, whether the First Amendment might have afforded the Appellants any relief to Kasper's claims.

ages for both malicious prosecution and intentional infliction of emotional distress, and in reviewing this aspect of its verdict on appeal we are not permitted to substitute our judgment for that of the jury.[58] As we have repeatedly emphasized, "[p]resumptions favor the validity of verdicts and a construction, if possible, will be given which will uphold them."[59] And after carefully examining the testimony and evidence presented at trial, we conclude that, under the "any evidence" standard of review, it is possible to construe the evidence presented at trial in a manner that upholds the jury's decision to award Kasper separate and distinct damages for malicious prosecution and intentional infliction of emotional distress.[60] For all of these reasons, we hold that the jury's separate awards of damages for malicious prosecution and intentional infliction of emotional distress do not constitute an impermissible double recovery under Georgia law.[61]

Having concluded that at least a portion of Kasper's damage award may be improper (i.e., that portion of her defamation award potentially attributed to Penton), we are compelled to reverse the judgment on that claim and remand for a new trial solely on the issue of damages against Turnage for his defamation of Kasper. We further reverse the defamation judgment entered against Penton, and affirm the judgment in all other respects.

*Judgment affirmed in part and reversed in part, and case remanded. Barnes, P. J., and Blackwell, J., concur.*

DECIDED NOVEMBER 30, 2010.

*John D. Wales*, for appellants.

---

[58] *Turner Broad. Sys., Inc.*, 303 Ga. App. at 612 ("Our role is not to enter the jury box. The jury made its award in its enlightened conscience and based upon the evidence (presented). Thus, as the trial court declined to disturb the jury's verdict, we likewise decline to find error." (citation and punctuation omitted)).

[59] *Esprit Log and Timber Frame Homes*, 302 Ga. App. at 554-55 (citation and punctuation omitted); *see also Se. Sec. Ins. Co. v. Hotle*, 222 Ga. App. 161, 164 (1) (e) (473 SE2d 256) (1996) (same).

[60] *See Cline v. Union County, Iowa*, 182 FSupp.2d 791, 799 (S.D. Iowa 2001) (holding that plaintiff seeking to prevail on a claim for intentional infliction of emotional distress had generated fact questions sufficient to preclude summary adjudication concerning "whether the circumstances, including the time, place and publicity surrounding Cline's alleged false arrest and malicious prosecution, resulted in humiliation, worry, and shame sufficient to constitute severe or extreme emotional distress").

[61] *See, e.g., Alternative Health Care Sys., Inc. v. McCown*, 237 Ga. App. 355, 356 (514 SE2d 691) (1999) (holding that a "jury may award different measures of damages on multiple claims if the evidence establishes several distinct torts").

*Melinda D. Taylor, Sharon T. McCoy*, for appellee.